Steven W. Klutkowski, Esq.
**DUKE, HOLZMAN, PHOTIADIS & GRESENS LLP**
Attorneys for Plaintiffs
701 Seneca Street, Suite 750
Buffalo, New York 14210
Tel.: (716) 870- 2124

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

I.B. TRADING, INC.
711 3rd Avenue, 6th Floor
New York, New York 10017

IAN BEHAR
711 3rd Avenue, 6th Floor
New York, New York 10017

JORON MANAGEMENT, LLC
640 Ellicott Street, Suite 108
Buffalo, New York 14203

**COMPLAINT AND JURY DEMAND**

JORDAN LEVY
640 Ellicott Street, Suite 108
Buffalo, New York 14203

THOMAS MACEY AND
ELIZABETH MACEY, Individually and
as Tenancy by the Entirety
1301 Thatch Palm Drive
Boca Raton, Florida 33432

Civil No. ___________

ECF CASE

FUSION CAPITAL LLC
711 3rd Avenue, 6th Floor
New York, New York 10017

RYAN SASSON
711 3rd Avenue, 6th Floor
New York, New York 10017

ROBERT KOLTUN
1075 Park Avenue, Apt. 2
New York, New York 10128

ARTHUR LUXENBERG
11 Jordan Drive
Great Neck, New York 11021

Plaintiffs,

v.

TRIPOINT GLOBAL EQUITIES, LLC
1450 Broadway, 26th Floor
New York, New York 10018

ROBERT NATHAN
1450 Broadway, 26th Floor
New York, New York 10018

MARK H. ELENOWITZ
1450 Broadway, 26th Floor
New York, New York 10018

MICHAEL BOSWELL
1450 Broadway, 26th Floor
New York, New York 10018

Defendants.

---

Plaintiffs I.B. TRADING, INC., IAN BEHAR, JORON MANAGEMENT, LLC, JORDAN LEVY, THOMAS MACEY AND ELIZABETH MACEY, Individually and as Tenancy by the Entirety, FUSION CAPITAL LLC, RYAN SASSON, ROBERT KOLTUN, and ARTHUR LUXENBERG ("Plaintiffs"), by their attorneys, Duke, Holzman, Photiadis & Gresens LLP, for their complaint against Defendants TRIPOINT GLOBAL EQUITIES, LLC, ROBERT NATHAN, MARK H. ELENOWITZ, and MICHAEL BOSWELL ("Defendants"), allege upon knowledge as to themselves, and upon information and belief as to all other matters, as follows:

**PARTIES**

1. At all times hereinafter mentioned, Plaintiff I.B. Trading, Inc. ("I.B. Trading") was

a domestic business corporation organized and existing under the laws of New York, with its principal place of business at 711 3rd Avenue, 6th Floor, New York, New York 10017.

2. Plaintiff Ian Behar ("Behar") is a natural person with an office at 711 3rd Avenue, 6th Floor, New York, New York 10017.

3. Behar is the principal and manager of I.B. Trading.

4. At all times hereinafter mentioned, Plaintiff JoRon Management, LLC ("JoRon") was a domestic limited liability company organized and existing under the laws of New York, with its principal place of business at 640 Ellicott Street, Suite 108, Buffalo, New York 14203.

5. Plaintiff Jordan Levy ("Levy") is a natural person with an office at 640 Ellicott Street, Suite 108, Buffalo, New York 14203.

6. Levy is the principal and manager of JoRon.

7. At all times hereinafter mentioned, Plaintiff Fusion Capital, LLC ("Fusion") was a domestic limited liability company organized and existing under the laws of New York, with its principal place of business at 711 3rd Avenue, 6th Floor, New York, New York 10017.

8. Plaintiff Ryan Sasson ("Sasson") is a natural person with an office at 711 3rd Avenue, 6th Floor, New York, New York 10017.

9. Sasson is the principal and manager of Fusion.

10. Plaintiffs Thomas Macey and Elizabeth Macey are natural people who reside in Boca Raton, Florida. Plaintiffs Thomas Macey and Elizabeth Macey are married and conducted business relevant to this dispute as Tenancy by the Entirety. Plaintiff Thomas Macey ("Macey") manages the Tenancy by the Entirety.

11. Plaintiff Robert Kulton ("Kulton") is a natural person who resides in New York,

New York.

12. Plaintiff Arthur Luxenberg ("Luxenberg") is a natural person who resides in Nassau County, New York.

13. Prior to the events resulting in this lawsuit, as well as all times hereinafter mentioned, Plaintiffs were a group of high net-worth friends, business associates, and companies who invested together.

14. Upon information and belief, at all times hereinafter mentioned, Defendant Tripoint Global Equities, LLC ("Tripoint"), was and is a limited liability company organized and existing under the laws of Maryland with its principal place of business at 1450 Broadway, 26th Floor, New York, New York.

15. Tripoint is registered to conduct business in the State of New York.

16. Tripoint is registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer.

17. According to its website (http://www.tripointglobalequities.com), Tripoint "is a global investment bank focused on assisting fast growing companies"; are "specialists dedicated to helping small and mid-cap companies access U.S. capital markets and achieve their growth objectives"; and "are pioneers in equity crowdfinance." Among other things, Tripoint specializes in "a full suite of services" and "advisory services," "banking," "private investments," "private equity," and "sales and trading."

18. Upon information and belief, Defendant Robert Nathan is a natural person that resides and has a professional office in New York, New York.

19. At all times hereinafter mentioned, Nathan was a Director of Tripoint.

20. Nathan holds himself out as follows on Tripoint's webpage (http://www.tripointglobalequities.com):

> With over 20 years in the industry, Mr. Nathan brings his vast network of clients and expertise with him to TriPoint joining the firm in 2015. He focuses on raising Debt, Equity and Mezzanine Financing for emerging growth companies in the Technology and Healthcare sectors. These companies have sub $500 million valuations and the offerings range in size from $3 to $20 million. His clients include family offices, private equity firms, hedge funds and high net worth individuals, among others. Prior to joining TriPoint, he served as Senior Vice President at Monarch Capital Group. Mr. Nathan is a graduate of Ithaca College. He holds Series 7 & 63 licenses.

21. Upon information and belief, Defendant Mike Boswell ("Boswell") is a natural person having a residence and professional office in New York, New York.

22. At all times hereinafter mentioned, Boswell was a founder of Tripoint and its President, Chief Operating Officer, and Chief Compliance Officer.

23. Boswell holds himself out as follows on Tripoint's webpage (http://www.tripointglobalequities.com):

> Mr. Boswell is co-founder, President, Chief Operating Officer and Chief Compliance Officer of the firm. He is also a Managing Director of TriPoint Capital Advisors, LLC, a merchant banking and financial consulting affiliate of TriPoint Global Equities. Mr. Boswell provides high-level financial services to start-up businesses and small to mid-sized companies, including holding executive and CFO positions with client companies. With TriPoint Capital Advisors, he has assisted numerous companies by advising them on corporate finance, corporate structure, corporate governance, mergers and acquisitions, SOX 404 compliance, implications of various SEC rules and FASB Emerging Issues Task Force issues as they relate to private placements, SEC reporting and disclosure requirements and employee option programs.
>
> Mr. Boswell is currently CFO of Mission Solutions Group, a privately held defense sector company and General Technologies Corp, a privately held technology company. He was previously CFO of Ocean Smart International and has advised numerous public companies on accounting and valuation issues. Prior to the founding of TriPoint, Mr. Boswell held a number of executive positions

> focusing on business development and management consulting. He also spent eight years as a senior analyst and senior engineer. Mr. Boswell earned a M.B.A. from Johns Hopkins University and a B.S. degree in Mechanical Engineering from University of Maryland. He holds the Series 24, 62, 63, 79, 82 and 99 licenses.

24. Upon information and belief, Defendant Mark H. Elenowitz is a natural person having a residence in Nassau County, New York, and professional office in New York, New York.

25. At all times hereinafter mentioned, Elenowitz was a founder of Tripoint and its Chief Executive Officer ("CEO").

26. Elenowitz holds himself out as follows on Tripoint's webpage (http://www.tripointglobalequities.com):

> Mr. Elenowitz is responsible for the overall corporate development of the firm and advising clients on structuring, financings and acquisitions. He has extensive experience in advising clients on SOX 404 compliance, employee option programs, and capital markets navigation including acting as a member of the board of directors. For over 24 years he has worked with numerous public and private companies.
>
> Mr. Elenowitz integrates a strong, successful entrepreneurial background with extensive financial services and capital markets experience. He has assisted numerous companies in a "soup-to-nuts" process, preparing them for life as a public company and advising them on an ongoing basis as to further rounds of financing, strategic acquisitions and a broader investor base via a listing on a higher securities exchange or market. He is an expert in capital markets investigative analysis of trading activity, short selling and market activity providing investigative services for Board of Directors, Special Committees and public companies. Mr. Elenowitz also serves as an expert witness in FINRA arbitrations and court actions.
>
> Mr. Elenowitz is also Managing Director of TriPoint Capital Advisors, LLC, a merchant banking and financial consulting affiliate of TriPoint Global Equities. He is the recipient of several entrepreneurial awards and has been profiled in BusinessWeek and CNBC, as well as several other publications. He is a graduate of the University of Maryland School of Business and Management with a B.S. in

Finance. He holds Series 24, 62, 63, 79, 82 and 99 licenses.

27. At all times hereinafter mentioned, Nathan, Boswell, and Elenowitz were agents of Tripoint.

28. At all times hereinafter mentioned, Nathan, Boswell, and Elenowitz controlled Tripoint by virtue of their key positions at Tripoint and their authority over Tripoint's operations and were therefore each a "controlling person" for the Acts of Tripoint under Section 20(a) of the Securities and Exchange Act of 1934.

## **JURISDICITION AND VENUE**

29. This Court has jurisdiction pursuant to Section 27 of the Securities and Exchange Act (15 USCS § 78aa(a)), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

30. Venue is proper in this District pursuant to Section 27 of the Securities and Exchange Act (15 USCS § 78aa(a)) and 28 U.S.C. § 1391.

## **BACKGROUND**

### **I. The Ponzi Scheme**

31. Joseph Meli ("Meli") and Matthew Harriton ("Harriton"), and companies they formed, owned, controlled, and managed, including 875 Holdings, LLC, 127 Holdings, LLC, Advance Entertainment, LLC, and Advance Entertainment II, LLC (collectively, the "Ponzi Dealers"), participated in a fraudulent ticket investment scheme pursuant to which they raised millions of dollars from investors for purported investments in ticket reselling enterprises

involving live events including theatrical performances and concerts.[1]

32. The Ponzi Dealers represented that they would and did purchase large blocks of tickets for popular concerts and musicals and resell the tickets on the secondary market at a profit for the investors. The Ponzi Dealers represented that tickets would be, and were, purchased under ticket supply agreements they made with producers, sponsors, and other industry insiders involved in operating and selling the live events.

33. Contrary to the Ponzi Dealers' representations, they did not have agreements for the purchase of tickets that they could resell on the secondary market, and only a small portion of investor funds, if any, were used to make ticket-related purchases. Instead, the investments were misappropriated for the Ponzi Dealers' personal use and to provide purported investment returns to earlier investors with the Ponzi Dealers to keep the fraudulent scheme ongoing.

A. 875 Holdings LLC

34. At all relevant times, 875 Holdings, LLC ("875 Holdings") was a company that the Ponzi Dealers used to carry out the fraudulent ticket scheme.

35. At all relevant times, 875 Holdings was managed by Meli and Harriton.

36. At all relevant times, Harrington controlled and owned an 80% interest (through two intermediary LLCs) in 875 Holdings.

37. 875 Holdings represented to investors that it would and did use investor funds to purchase blocks of tickets to live events, primarily through agreements it would and did negotiate

---

[1] This "Ponzi Scheme" is the subject of a pending (1) criminal complaint, United States v. Simmons and Meli, 17 MAG 647 (S.D.N.Y. 2017), and (2) SEC lawsuit, SEC v. Meli, Harriton, et al., 1:17-cv-00632 (S.D.N.Y. 2017). The herein allegations regarding the Ponzi Dealer's scheme includes information from the criminal and SEC matters.

with the operators of those events pursuant to its unique industry knowledge, experience, and contacts, and resell those tickets on the secondary market for a profit.

38. Contrary to the 875 Holdings' representations, it did not enter ticket supply agreements to purchase tickets, and only a small portion of investors' money, if any, was used to purchase tickets to events. Instead, the investments were misappropriated for the personal use of the Ponzi Dealers and to provide purported investment returns to other earlier investors with the Ponzi Dealers to keep the fraudulent scheme ongoing.

B. Advance Entertainment II, LLC

39. Advanced Entertainment II was also created and managed by Meli and Harriton as a company that the Ponzi Dealers used to carry out the fraudulent ticket scheme.

40. Meli and Harriton are the direct or indirect owners of Advanced Entertainment II. Meli owns 100% of Advance Entertainment which, in turn, owns an 80% interest in Advance Entertainment II. Harriton directly owns a 20% interest in Advance Entertainment II.

41. Advanced Entertainment II represented to investors that it was created to carry out exclusive investment opportunities to purchase blocks of tickets to specific, targeted high-profile events, such as and including the Broadway musical Hamilton and Adele concerts, primarily through agreements it negotiated with the operators of those events pursuant to its unique industry knowledge, experience, and contacts, and to resell those tickets at a profit.

42. Contrary to the Advanced Entertainment II's representations, it did not enter ticket supply agreements to purchase tickets to events, and only small portion of investors' money, if any, was used to purchase tickets to Hamilton, Adele, or other events. Instead, the investments were misappropriated for the personal use of the Ponzi Dealers and to provide purported

investment returns to other earlier investors with the Ponzi Dealers to keep the fraudulent scheme ongoing.

## II. Defendant Tripoint's Solicitation of Plaintiffs to Invest in the Ponzi Scheme

### A. Solicitation to Invest in 875 Holdings

43. Defendant Robert Nathan ("Nathan"), Director of Defendant Tripoint Global Equities LLC ("Tripoint"), met Plaintiff Ian Behar ("Behar") approximately ten years prior to the events resulting in this lawsuit. Based on their pre-existing relationship, Nathan knew that Behar was a high-net worth individual and part of an investment group made up of friends and business associates.

44. Despite knowing Behar for nearly ten years, the 875 Holdings, LLC ("85 Holdings") investment was the first deal Nathan asked Behar to invest in. Nathan advised that he was contacting Behar about the ticket investment because it was a complete "no brainer" that he believed Behar and his group of investors would be interested in.

45. Upon information and belief, Nathan and Tripoint knew or should have known that 875 Holdings was a fraudulent investment when they solicited Behar and his investment group—Plaintiffs.

46. Behar agreed to meet with Nathan as well as Meli and Harriton, the owners and managers of 875 Holdings, about the ticket investment.

47. On December 10, 2015, Nathan, Meli, and Harriton met with Behar and Plaintiff Jordan Levy ("Levy") at Behar's office at 225 West 39th Street, New York, New York, to pitch the 875 Holdings ticket investment.

48. At the initial meeting, Nathan, Meli, and Harriton presented the ticket investment

as a joint venture and partnership between Tripoint and 875 Holdings under which Tripoint would receive a broker commission for investors it produced for the investment, and 875 Holdings would operate and manage the investment.

49. At the initial meeting, Nathan touted Tripoint's financial and investment expertise and invited Behar and Levy to review Tripoint's website.

50. At the initial meeting, for the purpose of inducing Plaintiffs to invest in 875 Holdings, Nathan made the following false representations that he knew or should have known were untrue, or that were made with reckless disregard for the truth:

a. Nathan represented that Tripoint had fully investigated and vetted the 875 Holdings investment and highly recommended it;

b. Nathan also represented that he grew up and attended high school in Long Island with Harriton and that they had been friends for years;

c. Nathan represented that Tripoint principals had personally invested $1,500,000 of their own money into the ticket investment, including that he had personally invested $250,000 of his own money; and

d. Nathan represented that Meli had already invested $15,000,000 of his own money in the ticket investment and that Harriton had invested $3,000,000 of his own money in the ticket investment.

e. Nathan advised that the ticket investments were extremely safe and low risk because they were backed by actual tickets to real events, and insurance had been procured that would reimburse investors the price of tickets if the event was cancelled.

51. At the initial meeting, Nathan, Meli, and Harriton presented the "875 Holdings, LLC Investment Opportunity Executive Summary" related to the ticket investment (hereinafter, "Executive Summary").

52. Each page of the Executive Summary contained both "875 Holdings, LLC" and

"Tripoint Global Equities, LLC," including Tripoint's logo, thus indicating that it was prepared and being presented by both entities.

53. The Executive Summary provided, among other things:

a. The investment "model is very simple and very transparent – 875 will purchase blocks of tickets to live events, in most cases from an event sponsor (promoter, team, venue, etc.) in advance of an event, and be repaid when those tickets are sold to secondary market brokers in bulk or directly to the fans who attend the event."

b. "It is anticipated that 875 will deliver returns to its equity holders of in excess of 20% per annum."

c. "The 875 management team possesses a deep and very unique mix of live event promotion, ticketing, and entertainment finance experience."

d. "There are currently very few financiers with a specific focus on and understanding of the full breadth of the live events business;"

e. "The 875 principals have a deep, focused understanding of the live events business";

f. "875 will enter into an agreement to purchase an allocation of tickets to an upcoming event or series of events, in most cases from an "Event Sponsor" (typically a promoter, producer, venue, or team). In certain other cases, the tickets may be purchased in an arms length transaction (or transaction more favorable to the Company) from an entity or individual which may be affiliated with the Company, but which itself purchased the tickets from an Event Sponsor."

g. "A typical purchase agreement for an allocation of tickets will specify a purchase price which represents a discount to the anticipated sale price of the tickets (typically, the face value), and in some circumstances tickets will be purchased at face value or a small premium. These instances would only be for premium seating for "hot" events (e.g. tickets in the first 10 rows for The Grateful Dead concert), anticipated to be resold in the secondary market in advance of the performance at a significant premium."

h. "No Cancellation Risk – 875 will not agree to bear the economic risk of an event cancellation (subject in certain cases to service charges which may be imposed by the Sales Agent). In the event of a cancellation, 875 will require that the purchased tickets be honored if the event is rescheduled, that the Event Sponsor refund the full purchase price; and/or that acceptable insurance arrangements are in

place that will cover the purchased inventory and any expense involved to process ticket refunds."

54. Upon information and belief, the representations made in Tripoint's and 875 Holdings' Executive Summary were knowingly false and made for the purpose of inducing Plaintiffs to invest in the fraudulent scheme, including, but not limited to, the fact that 875 Holdings never intended to enter into ticket purchase agreements or use investors' money to purchase tickets for resale on the secondary market.

55. At the initial meeting and pursuant to the Executive Summary, Plaintiffs were offered non-management, non-voting "Class B Interests" in 875 Holdings.

56. Class B Interest holders in 875 Holdings were to receive a return on their investment as follows: "100% of all profits of 875 will be allocated (pro rata, based on investments in 875) to the holders of Class B Interests ("Class B Members") to the extent equal to a 15% annual rate of return based on invested capital of Class B Members ("Class B Investments"); thereafter, 80% of each incremental dollar of profits will be allocated to the Class B Members until they receive an additional 5% annual rate of return on Class B Investments; and thereafter, 20% of all other incremental profit will be allocated to the Class B Members."

57. The Executive Summary also stated that 875 Holdings intended to enter a "placement agreement" with TriPoint that "will provide that [TriPoint] will be appointed as a non exclusive placement agent of the [875 Holdings], for a twelve month period, to arrange, on behalf of the Company, on a best efforts basis, sales of Class B Interests to accredited investors identified by [TriPoint] . . . . As consideration for the arrangement of sales of Class B Interests to persons and entities identified by [TriPoint], the Company shall pay [TriPoint] a cash

placement fee equal to 5% on any gross proceeds received by the Company in connection with any such sale . . . .”

58. Upon information and belief, Nathan and Tripoint received a greater benefit than they disclosed to Plaintiffs for recommending, advising, and steering Plaintiffs to invest in the fraudulent investment scheme.

59. Thereafter, in mid-December 2016, Behar attended another meeting concerning the ticket investment at Tripoint’s offices in New York, New York, with Nathan and Defendant Mark Elenowitz, Tripoint’s founder and CEO.

60. Elenowitz confirmed that Tripoint had investigated and vetted the ticket investment, and advised that investment was a no-brainer because the investments were backed by the physical tickets to the events being purchased with the investment funds. Elenowitz’s representations, which were intended to induce Plaintiffs to invest in 875 Holdings, were either knowingly false or made with reckless disregard for the truth because 875 Holdings not purchase tickets, intend to purchase tickets, or have agreements in place to purchase tickets.

61. Thereafter, Nathan emailed Plaintiffs’ documentation regarding the investment including the Executive Summary, a Subscription Agreement for Class B Interests of 875 Holdings (“Subscription Agreement”), and 875 Holdings Limited Liability Company Agreement (“875 Holdings LLC Agreement”).

62. The Subscription Agreement, among other things, referenced and incorporated the Executive Summary and the 875 Holdings LLC Agreement.

63. The 875 Holdings LLC Agreement represented that the “Purpose” of 875 Holdings “shall be to acquire and resell, individually and through its subsidiaries, tickets to various events,

including concerts, theater, sports, museums, and other events." Nathan and Tripoint either knew that those representations were false or had a reckless disregard for the truth of those representations because 875 Holdings did not purchase tickets, intend to purchase tickets, or have agreements in place to purchase tickets.

64. In addition to the aforementioned meetings, prior to investing, Plaintiffs had multiple telephone and in-person meetings both with Nathan and with Nathan and Harriton together regarding the ticket investment. During those meetings and conversations, Nathan made and/or restated the following false representations that he knew or should have known were untrue, or that were made with reckless disregarded for the truth:

a. Nathan advised that the Tripoint had "extensive financial services" experience, including investigative services, finance experts, a corporate lawyer, and compliance officer to ensure compliance with securities regulations. Nathan pointed Plaintiffs to Tripoint's website for further information on its expertise. Nathan specifically represented that Tripoint conducted an investigation and complete due diligence on the ticket investment, and recommended the investment;

b. In response to questions regarding Meli, Harriton, and their companies, including 875 Holdings, Nathan advised that Tripoint had analyzed the ticket resale companies' financial statements and business records to ensure that all corporate governance was handled appropriately including ensuring that the operators were handling financial and related issues in a customary and prudent manner;

c. In response to Plaintiff Macey's advisement that he was only interested in a low risk investment, Nathan responded that the ticket investment is very conservative as it is backed by the tickets themselves. Moreover, Nathan represented that insurance coverage was in place to cover the price of purchased tickets if an event was cancelled;

d. Nathan advised that the investment was a "no-brainer" because Tripoint and 875 Holdings had a deep understanding of the event business, key contacts, and were able to acquire "inside" and pre-sale access to the most desirable events;

e. Nathan also confirmed and restated that he grew up with Harriton and personally knew and trusted him, and that Meli, Harriton, himself, and other Tripoint principals had all invested their own money in the deal; and

f. In response Plaintiffs' request to review the agreements between 875 Holdings and the event producers under which Nathan represented 875 Holdings would be purchasing tickets for resale, Nathan stated that Tripoint and 875 Holdings' could not share the agreements because they were highly confidential. Nathan, however, assured Plaintiffs that Tripoint reviewed the agreements and were satisfied.

65. In reliance on Defendants' representation, Plaintiffs agreed to invest in 875 Holdings.

66. Nathan requested that Plaintiffs each complete a Subscription Agreement and provide other documentation to purchase Class B Interests in 875 Holdings.

67. Each Plaintiff executed the 875 Holdings Subscription Agreement and provided Tripoint other documentation Tripoint requested to complete Plaintiffs' purchases of Class B Interests in 875 Holdings. Tripoint's Chief Compliance Officer, Defendant Mike Boswell, and Nathan represented that Boswell reviewed the investment documentation to ensure compliance with rules "imposed by FINRA to prevent fraud and anti-money laundering."

68. Nathan assured Plaintiffs that, "[a]s an SEC regulated Investment Bank," Tripoint had "to comply with FINRA regulations pertaining to Anti Money Laundering and Fraud Prevention."

69. Upon information and belief, Nathan's and Boswell's statements about Tripoint's compliance review was knowingly false and made for the purpose of inducing Plaintiffs to invest in the fraudulent scheme.

70. Once Tripoint purportedly completed its review for compliance with FINA's anti-fraud rules, the investments were finalized. Plaintiffs collectively invested a total of $550,000 in 875 Holdings between December 2015 and February 2016 as follows:

a. Behar/I.B. Trading - $100,000 investment;

b. Levy/JoRon Management - $100,000 investment;

c. Sasson/Fusion Capital LLC - $100,000 investment;

d. Robert Koltun - $100,000 investment; and

e. Macey/Thomas and Elizabeth Macey as Tenancy by the Entirety - $150,000 investment.

71. Thereafter, on January 28, 2016, in response to an inquiry from Levy regarding obtaining Hamilton tickets, Harriton, with a copy to Nathan and Behar, advised, "Things are going well, I sent your administrator an update as I didn't have your email." Upon information and belief, Defendants knew or should have known that the investments were not "going well."

B. <u>Solicitation to Invest in Advance Entertainment II</u>

72. After obtaining investments for 875 Holdings from the majority of Plaintiffs, Nathan solicited Plaintiffs to invest in "Side Pocket" ticket investment opportunities.

73. The Side-Pocket investments, Nathan represented, were being offered only and exclusively to 875 Holdings investors. Nathan told Plaintiffs that they had to invest in 875 Holdings in order to be eligible to invest in the Side Pocket investments. According to Nathan, the Side Pocket investments would be through an affiliated special purpose company owned and managed by Meli and Harriton—Advance Entertainment II—and focus specifically on investing in tickets for targeted, in-demand events.

74. The first two events for which Nathan was soliciting Plaintiffs' investments were the Broadway production Hamilton and Adele's North American concert tour.

75. On January 27, 2016, Nathan provided Plaintiffs a letter authored by Harriton concerning the Side Pocket offerings. According to the letter, the reason that the Side Pocket investments were being offered through Advance Entertainment II, rather 875 Holdings, was because "875 already has significant positions in both and given prudent asset allocation management, we do not feel it wise to increase these positions within 875 until more capital is raised. As such, we are syndicating these two opportunities to existing investors." Those statements, which were sent to Plaintiffs by Nathan, were false and Defendants knew or should have known that those representations were false.

76. The solicitation letter provided by Nathan stated that the Side Pocket investments "will be for a defined period, repaid including profits on or before November 30, 2016," and will provide a "10% annualized preference to investor" and "50% of any additional upside." The two Side Pocket investments being offered were "2016 Event 1: Hamilton, NY" and "2016 Event II: Adele North American Tour."

77. Plaintiffs had a teleconference with Nathan in early February 2016 regarding the Side Pocket investments.

78. Regarding the Hamilton Side pocket opportunity, Nathan represented that Advance Entertainment II had a contract with the producer of Hamilton to buy 20% of the house seats for every performance so that the producers could use the money to get the Hamilton London and Hamilton road productions started. Nathan represented that the producer of Hamilton needed $7,500,000 for the London production and road shows and was raising the money through this

investment. Nathan knew that these statements were false, should have known that these statements were false, or recklessly disregarded the truth of these statements, which were made to induce Plaintiffs to invest in the Hamilton Side Pocket investment. Indeed, Advance Entertainment II did not have an agreement with a Hamilton producer for the purchase of tickets or purchase Hamilton tickets as represented.

79. Regarding the Adele Side pocket opportunity, Nathan represented that Advance Entertainment II had a ticket purchase agreement with the producer of Adele's North American tour, who was funding future concerts. Nathan knew that these statements were false, should have known that these statements were false, or recklessly disregarded the truth of these statements, which were made to induce Plaintiffs to invest in the Adele Side Pocket investment. Indeed, Advance Entertainment II did not have an agreement with an Adele producer for the purchase of tickets or purchase Hamilton tickets as represented.

80. Nathan also represented that Tripoint was working with Advance Entertainment II, Harriton, and Meli to draft the Subscription Agreement for investment in the Side Pocket investments. For example, on February 4, 2016, Nathan emailed Plaintiff Macey providing, "**We** are currently drafting the Subscription Agreement for the Hamilton and Adele Side Deals and we will forward it to you to fill out once shortly." (emphasis added).

81. On February 23, 2016, in response to a question from Plaintiff Macey to Nathan regarding why the Side Pocket investments were being offered through Advanced Entertainment II, a new entity formed by Meli and Harriton, rather than through a pre-existing entity they owned and managed, Advanced Entertainment LLC, Harriton provided the following in an email with a copy to Nathan:

> Advance Entertainment, LLC is the personal holding company of Joe Meli. As such it not only held the ticket related inventory but also several of his other investments. To eliminate any confusion and to make tracking and performance results easier to report we form an SPV, Advance Entertainment II, LLC, to hold only ticket related assets;
>
> We then transferred the ticket related assets for the Adele and Hamilton transaction to the new entity;

82. Nathan and Tripoint, who were copied on Harriton's email, knew or should have known that Harriton's explanation was false because no ticket-related assets for Adele and Hamilton actually existed.

83. On February 24, 2016, Tripoint and Nathan circulated to Plaintiffs a Profit Participation Purchase Agreement for investing the Side Pocket investments. The Profit Participation Purchase Agreement provided that Advanced Entertainment II would enter "agreements with managers, producer, promoters and other parties having ownership and control of to be issued tickets to various concerts, theatrical performances and other events (each, an "Event")" and that the investors under the Profit Participation Purchase Agreement would have "the right to acquire a participation interest in a portion of the proceeds derived by the [Advanced Entertainment II] from the re-sale of tickets it intends to acquire for a specific Event."

84. Those statements in the Profit Participation Purchase Agreement were knowingly false or made with reckless disregard for the truth and made to induce Plaintiffs to invest in the Side Pocket investments. Indeed, Advance Entertainment II did not have agreements or intend to enter agreements for the purchase of tickets related to Advanced Entertainment II investments.

85. The Profit Participation Purchase Agreement stated that broker/dealers were entitled to a 3% broker fee on gross proceeds received by the Advanced Entertainment II for participation interests purchased that the broker solicited. Upon information and belief, Tripoint

received a larger commission or other benefits for steering Plaintiffs to invest in the Side Pocket investments than represented to Plaintiffs.

86. The Profit Participation Purchase Agreement also included "Participation Schedules" that Plaintiffs would need to execute to invest in either of the first two "Events" being offered under the Profit Participation Purchase Agreement—Hamilton and Adele. The Participation Schedules stated that within nine months from the investment the investor would receive a 10% "preference percentage," or return on investment, and a "remainder percentage" of 50%, meaning 50% of any additional profits from the ticket resales.

87. In reliance on Defendants' aforementioned representation concerning the Side Pocket investments, Plaintiffs determined to invest in the Hamilton and Adele Side Pocket offerings.

88. To that end, Plaintiffs each executed a Profit Participation Purchase Agreement with Advance Entertainment II and Participation Schedules for the Hamilton and Adele events. Between February 26, 2016 and March 3, 2016, Plaintiffs invested a total of $750,000 in the Hamilton Side Pocket investment and $450,000 in the Adele Side Pocket Investment, for total of $1,200,000 in Side Pocket investments, as follows:

a. Behar/I.B. Trading - $200,000 Hamilton Side Pocket investment and $200,000 Adele Side Pocket investment;

b. Sasson/Fusion Capital LLC - $50,000 Hamilton Side Pocket investment and $50,000 Adele Side Pocket investment;

c. Robert Koltun - $100,000 Hamilton Side Pocket investment and $100,000 Adele Side Pocket investment;

d. Arthur Luxenberg - $100,000 Hamilton Side Pocket investment; and

e. Macey/Thomas and Elizabeth Macey as Tenancy by the Entirety - $300,000 Hamilton Side Pocket investment and $200,000 Adelle Side Pocket investment.

89. On March 1, 2016, when the other Plaintiffs had already invested in the Side Pocket investments, but Macey had not yet invested, Nathan assured Macey, "**We** are fully committed on Both side pocket opportunities and are circling on the remaining funds." (emphasis added).

90. On March 2, 2016, still having not compelled Macey to invest in the Side Pocket investments, Nathan emailed Macey stating, "We have reserved $500K for you in both Hamilton and Adele. Hamilton is now over subscribed and we need to confirm that you are moving forward or if not please let us know so we can release the block to other interested parties." Upon information and belief, those representations were knowingly false and made to induce Macey to invest in the Side Pocket investments as quickly as possible.

91. Thereafter, on March 3, 2016, in reliance on Defendants' representations, Macey purchased his aforementioned $500,000 interests in the Side Pocket investments.

92. In June and July 2016, Macey sent Nathan inquiries about the investments. Nathan assured Macey that the ticket business was in great shape, that Plaintiffs' investments were sound, and that Tripoint continues to recommend the ticket business investment to clients and investors. Upon information and belief, those statements were knowingly false and made to prevent Plaintiffs' further inquiries into the fraudulent scheme and to induce Plaintiffs to invest in future fraudulent ticket investments.

93. Thereafter, on August 1, 2016, Nathan attempted to extract more money from Plaintiffs by soliciting them for investments in a third Side Pocket opportunity ("Event III") related to the Coachella concert event. Nathan presented Plaintiffs with the investment and advised that they would have to hurry because "[t]he transaction is going to close soon." These were knowing misrepresentations made to induce Plaintiffs to invest more money in the fraudulent ticket scheme. Indeed, no agreement or pending transaction to purchase Coachella tickets existed.

94. Having not received investments for Coachella event, Nathan sent Plaintiff Behar an email on August 17, 2016, again attempting to induce his investment. Nathan provided, "One of the investors in Event III needed to reduce his investment from $600K to $300K last minute. So there is temporarily a small opportunity to invest if your liquidity has changed. Please let me know ASAP." These were knowing misrepresentations made to induce Behar to invest because there was no investor that reduced his investment last minute. Indeed, there were no Coachella tickets being purchased.

95. Although Plaintiffs ultimately did not invest in the Coachella event, Nathan's misrepresentations with regard to that event aimed at inducing Plaintiffs' investments in the continuing and ongoing fraudulent ticket investment scheme is further evidence of Defendants' fraudulent conduct.

96. In December 29, 2016, Nathan replied to Plaintiffs' inquiries regarding their investments by stating that they would receive distributions related to the Side Pocket investments "within the next 7-10 business days." Regarding Hamilton, Nathan stated "we have received 91% of our investment to date" and "the next distribution will include profits from this investment."

Regarding Adele, Nathan stated, "we should expect to receive 1/3 of our investment back shortly" and "1/3 around the mid-end of January and the final distribution mid to late February." Upon information and belief, those statements were knowingly false and made to prevent Plaintiffs further inquiries into the fraudulent scheme.

97. Upon Plaintiffs further inquiry regarding "why did they miss their target of having both investments and profits paid back in 2016?" and "how much longer on each do they expect it to take?", Harriton responded directly, with a copy to Nathan as follows:

> Event I we have already distributed 91% of invested capital and continue to distribute as money is collected, some of the inventory was pushed back to performances in 2017 for a variety of reasons but we expect to fully liquidate during first half of 2017 with economics along the lines we have been seeing.
>
> We sold Event II as a block to a financial institution, the payment terms were for three payments with the total received by January 31st 2017.

98. Defendants knew or should have known that these representations were false, or recklessly disregarded the falsity of these statements, which were made to prevent Plaintiffs' further inquiries into the fraudulent scheme.

99. On January 26, 2017, the United States of America filed a criminal complaint against Meli for securities fraud and wire fraud related to aforementioned ticket investment scheme. United States v. Simmons and Meli, 17 MAG 647 (S.D.N.Y. 2017). The criminal complaint was supported by the sworn statement of a Special Agent of the Federal Bureau of Investigation ("FBI") that included Meli's recorded conversations explaining the ticket-related Ponzi Scheme.

100. On January 27, 2017, the SEC filed a lawsuit against, among others, Meli, Harriton, 875 Holdings, and Advance Entertainment II, for securities fraud related to

aforementioned ticket-related investment scheme. SEC v. Meli, Harriton, et al., 1:17-cv-00632 (S.D.N.Y. 2017).

101. At all aforementioned times, Nathan, Boswell, and Elenowitz were agents of Tripoint. As such, Tripoint is liable for the conduct of Nathan, Boswell, and Elenowitz.

**FIRST CAUSE OF ACTION**
**(Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5)**

102. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

103. Defendants, directly or indirectly, by the use of means or instrumentality of interstate commerce or of the mails, used or employed, in connection with the purchase or sale of securities, manipulative or deceptive devices or contrivances in contravention of the rules and regulations prescribed by the SEC, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

104. Defendants, directly or indirectly, in connection with the purchase or sale of securities, used or employed a device, scheme, or artifice to defraud.

105. Defendants, directly or indirectly, in connection with the purchase or sale of securities, made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading.

106. Defendants, directly or indirectly, in connection with the purchase or sale of securities, engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with the purchase or sale of securities.

107. As previously described, Defendants made material misrepresentations, material misstatements, and omitted material facts related to the sale of securities in order induce Plaintiffs to invest in a fraudulent ticket investment scheme, and to keep the fraudulent scheme going, which included the following false material representations:

a. Tripoint had fully investigated, vetted, and conducted complete due diligence on the ticket investments;

b. Tripoint had analyzed the Ponzi Dealers' financial statements and business records to ensure that all corporate governance was handled appropriately including ensuring that the operators were handling financial and related issues in a customary and prudent manner;

c. The ticket investments were conservative, safe, and low-risk because they were backed by the tickets themselves and insurance was in place that would reimburse the price of tickets if an event was cancelled;

d. Tripoint principals, Nathan, Meli, and Harriton, had all invested their own personal money into the ticket investments;

e. 875 Holdings entered into ticket supply agreements that Plaintiffs could not review because the agreements were highly confidential, but Tripoint reviewed the agreements and were satisfied;

f. 875 Holdings, Advance Entertainment II, Meli, Harriton, Nathan, and Tripoint had unique experience, contacts, and special access to the operators of the most desirable live events that allowed them to acquire contracts and "inside" and pre-sale purchases of tickets;

g. 875 Holdings and Advance Entertainment II purchased tickets for investment purposes and held ticket-related assets for resale on the secondary market;

h. Advance Entertainment II had a contract with the producer of Hamilton to buy 20% of the house seats for every performance so that the producers could use the money to get the Hamilton London and Hamilton road productions started;

i. Advance Entertainment II had a ticket purchase agreement with the producer of Adele's North American tour, who was funding future concerts;

j. The reason that the Side Pocket investments were being offered through

Advance Entertainment II rather than 875 Holdings or Advance Entertainment, included that "875 already has significant positions in both" and it would "eliminate any confusion and to make tracking and performance results easier;

k. The Hamilton Side pocket investment was "over subscribed" and being pursued by "other interested parties";

l. Returns on the Hamilton Side Pocket investment were delayed because "some of the inventory was pushed back to performances in 2017";

m. The Adele Side Pocket investment block of tickets was sold to a financial institution; and

n. 875 Holdings, Advance Entertainment II, Meli, Harriton, Nathan, and Tripoint were soliciting investments, purchasing tickets, and operating for a legitimate, lawful investment business.

108. In addition, upon information and belief, Defendants' material omissions included their failure to disclose the true payment and benefits they were receiving in exchanging for advising and recommending that Plaintiffs invest in the fraudulent ticket scheme.

109. Defendants had actual knowledge of the falsity of the aforementioned representations and omissions of material fact, reasonably should have known the falsity of the aforementioned representations and omissions of material fact, or acted with reckless disregard for the truth of the aforementioned false representations and omissions of material fact in that they failed to determine whether such facts were true, although their truth was ascertainable, but nevertheless represented to Plaintiffs that they knew the facts to be true.

110. Plaintiffs justifiably relied on Defendants aforementioned misrepresentations and omissions of material fact in determining to invest in the ticket investments, and Plaintiffs would not have invested in the ticket investments had they known the truth.

111. Although Defendants knew that Plaintiffs were only interested in safe, low-risk

investments, Defendants represented that the ticket securities were suitable for Plaintiffs' stated needs and recommended that Plaintiffs purchase the ticket securities despite the fact that Defendants knew that such securities were not suited for Plaintiffs' stated needs.

112. By reason of the foregoing, Defendants committed unlawful fraudulent conduct in connection with the purchase or sale of securities in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5).

113. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

114. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused by their violations of Section 10(b) of the Exchange Act and Rule 10b-5 in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**SECOND CAUSE OF ACTION**
**(Sections 9(a)(4) and 9(f) of the Exchange Act)**

115. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

116. Defendants, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, for the purpose of inducing the purchase or sale of securities, made statements of material facts that were false or misleading in the light of the circumstances under which they were made, and which and that Defendants knew or had reasonable grounds to believe were false or misleading with respect to material facts.

117. Defendants willfully participated with the Ponzi Dealers in a fraudulent scheme to, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, for the purpose of inducing the purchase or sale of securities, commit deceptive acts,

transactions, and practices related to the sale of securities.

118. Defendants willfully participated with the Ponzi Dealers in a fraudulent scheme to, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, for the purpose of inducing the purchase or sale of securities, made statements of material facts that were false or misleading in the light of the circumstances under which they were made, and which and that Defendants knew or had reasonable grounds to believe were false or misleading with respect to material facts.

119. By reason of the foregoing, Defendants violated Sections 9(a)(4) and 9(f) of the Exchange Act (15 U.S.C. §§ 78i(a)(4) and 78i(f)).

120. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

121. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused their violations of Sections 9(a)(4) and 9(f) of the Exchange Act in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

## THIRD CAUSE OF ACTION
**(Sections 20(a) of the Exchange Act against Defendants Nathan, Boswell, and Elenowitz)**

122. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

123. At all times mentioned, Defendants Nathan, Boswell, and Elenowitz controlled Tripoint by virtue of their key, high-level positions at Tripoint.

124. By reason of their positions at Tripoint, Defendants Nathan, Boswell, and Elenowitz had authority over Tripoint's operations, participated in the day-to-day management of Tripoint, and made strategic decisions for Tripoint.

125. As such, Defendants Nathan, Boswell, and Elenowitz were and are each a "controlling person" for the acts of Tripoint—the controlled person— pursuant to Section 20(a) of the Securities and Exchange Act.

126. In addition, as discussed above, Nathan, Boswell, and Elenowitz were culpable participants in the aforementioned fraud and securities violations.

127. By reason of the foregoing, Defendants Nathan, Boswell, and Elenowitz violated Section 20(a) of the Exchange Act (15 U.SC. § 78t).

128. By reason of the foregoing, Defendants Nathan, Boswell, and Elenowitz are individually jointly and severally liable to the same extent as Tripoint for violations of the Exchange Act.

129. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

130. By reason therefor, Plaintiffs seeks a judgment against Defendants Nathan, Boswell, and Elenowitz, jointly and severally, in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**FOURTH CAUSE OF ACTION**
**(Breach of Fiduciary Duties)**

131. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

132. A fiduciary relationship existed between Plaintiffs and Defendants arising out of Defendants' aforementioned conduct, acts, and representations.

133. In particular, a fiduciary duty existed between Plaintiffs and Defendants based on

Nathan and Baher's nearly ten-year relationship prior to the investments; Nathan's representations that he had a long-time personal relationship with and trusted Harriton; Defendants' representations, statements, and materials touting Tripoint's unique, special, and superior expertise and knowledge regarding finance, investments, securities, compliance, and the ticketing/live-event industry; Defendants' representations that it vetted and investigated the ticket investments and the companies offering them; Defendants' representations that, based on their investigation and expertise, the investments were safe and suitable for Plaintiffs; Defendants' affirmative recommendations and advice that Plaintiffs should purchase the ticket securities; Defendants' representations that they themselves invested in the ticket securities; Defendants' participation in the Executive Summary offering document for 875 Holdings, evidenced by Tripoint's name on each page of that document; and Defendants' participation in drafting the Subscription Agreement for the Side Pocket investment.

134. Pursuant to Defendants' aforementioned conduct, a special relationship of trust and confidence existed between the parties that created a fiduciary relationship and caused Plaintiffs to justifiably rely on Defendants representations, advice, and recommendations.

135. Defendants were aware and knew that Plaintiffs would rely on Defendants' representations, advice, and recommendations related to the ticket investments.

136. Defendants breached their fiduciary duties to Plaintiffs, including the duty to communicate honestly; the duty to conduct reasonable due diligence and investigation into the securities and security dealers being recommended; the duty to only recommend a security upon an adequate and reasonable basis; impart correcting information to Defendants and take reasonable steps to verify the truth of representations made to Plaintiffs; the duty to disclose facts

related to the investments that Defendants knew or could have ascertained; and, if essential information about a security was not available, the duty to disclose the unavailability of such information and identify the risks associated with the absence of such information.

137. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

138. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused their breaches in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**FIFTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**

139. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

140. Pursuant to the above-described special relationship between Plaintiffs and Defendants, Defendants had a duty to speak with care and impart correct information to Plaintiffs regarding the ticket investments.

141. Defendants provided Plaintiffs with incorrect and untruthful information relating to the ticket investments.

142. Defendants were aware and knew that Plaintiffs would rely on Defendants' representations, advise, and recommendations related to the ticket investments.

143. Plaintiffs reasonably and justifiably relied on the incorrect and untruthful information and advise that Defendants provided relating to the ticket investments.

144. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

145. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused their breaches in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**SIXTH CAUSE OF ACTION**
**(Negligence)**

146. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

147. Pursuant to the above-described relationship between Plaintiffs and Defendants, Defendants owed Plaintiffs a duty to exercise reasonable care when providing investment advice and recommendations that include a duty perform reasonable investigations into the investments they were recommending.

148. Defendants' breached their duties of care to Plaintiffs.

149. As a direct and proximate result of Defendants breaches of their duties, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

150. By reason therefor, Plaintiffs seeks a judgment against Defendants, jointly and severally, for all damages caused their breaches in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**SEVENTH CAUSE OF ACTION**
**(Fraud/Fraudulent Misrepresentation/Fraudulent Inducement)**

151. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

152. Pursuant to the previously described conduct, Defendants made knowingly false statements of material fact to Defendants, and knowingly concealed and omitted material facts from Defendants, related to the ticket investments.

153. Pursuant to the previously described conduct, Defendants' knowing false statements and omissions of material facts were made with the intent and purpose of inducing Plaintiffs to invest in the fraudulent ticket scheme.

154. Plaintiffs justifiably relied on Defendants' knowing misrepresentations and omissions of material facts in determining to invest in the ticket investments, and Plaintiffs would not have invested in the ticket investments had they known the truth.

155. As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

156. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused their fraud in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs, plus punitive damages due to Defendants' fraudulent and criminal conduct.

**EIGHTH CAUSE OF ACTION**
**(New York General Business Law § 349)**

157. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

158. Defendants committed deceptive acts and practices related to their business and in relation to furnishing services and advice in the State of New York.

159. Defendants' deceptive acts, practices, and misconduct were consumer-orientated and misleading in material respects.

160. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

161. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and

severally, for all damages caused their breaches in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**NINTH CAUSE OF ACTION**
**(Unjust Enrichment and Establishment of Constructive Trust)**

162. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

163. Defendants benefited at the expense of Plaintiffs by receiving commissions, payments, and other benefits from the Ponzi Dealers for steering Plaintiffs to invest in the ticket scheme.

164. Defendants also benefited at the expense of Plaintiffs to the extent Defendants' invested in the ticket schemes and received returns on their investments.

165. Equity and good conscience require restitution/compensation for the benefit that Defendants received at Plaintiffs' expense.

166. By reason therefor, Plaintiffs seek judgment against Defendants, jointly and severally, for all damages caused by Defendants' unjust enrichment, plus interest and costs.

167. Plaintiffs are also are entitled to, and seek, the establishment of a constructive trust impressed on the benefits to Defendants and inequitable conduct.

**WHEREFORE**, Plaintiffs demand judgment as follows:

1. Awarding damages in an amount to be proven at trial, but not less than $1,750,000, plus interest;

2. Declaring that Defendants have been unjustly enriched and an awarding of damages in an amount of Defendants' unjust enrichment to be proven at trial, plus interest, and imposing a constructive trust to recoup Defendants' fees,

unjust benefits and other assets for the benefit of Plaintiffs;

3. Awarding punitive damages arising from Defendants' fraudulent and criminal conduct;

4. Awarding Plaintiffs their costs and expenses related to this action, including reasonable attorney fees and other legal fees and costs; and

such other and further relief as the court finds just and proper.

**DUKE, HOLZMAN, PHOTIADIS & GRESENS LLP**

By: ***s/ Steven W. Klutkowski***
________________________________________
Steven W. Klutkowski, Esq.
*Attorneys for Plaintiff*s
701 Seneca Street, Suite 750
Buffalo, New York 14210
Tel.: (716) 855-1111

DATED: March 17, 2017