# EXHIBIT A

# 875 Holdings, LLC

# Investment Opportunity Executive Summary

## November 4, 2015

CONFIDENTIAL © 2015 **875 Holdings, LLC**



# Disclaimer and Confidentiality

THIS EXECUTIVE SUMMARY (THIS "SUMMARY") SUMMARIZES THE INTENDED BUSINESS OF, AND THE PRINCIPAL TERMS OF A CONTEMPLATED PROPOSED OFFERING OF LIMITED LIABILITY COMPANY INTERESTS OF, 875 HOLDINGS, LLC, A DELAWARE LIMITED LIABILITY COMPANY (THE "COMPANY"). THIS SUMMARY IS FOR DISCUSSION PURPOSES ONLY. THE PROPOSED TERMS AND CONDITIONS OF A POTENTIAL OFFERING OF LIMITED LIABILITY COMPANY INTERESTS IN THE COMPANY SET FORTH HEREIN ARE SUBJECT TO CHANGE AT THE DISCRETION OF THE MANAGEMENT OF THE COMPANY. THIS SUMMARY DOES NOT CONSTITUTE AN OFFER BY THE COMPANY TO SELL OR ISSUE ANY NOTES OR TO ISSUE ANY SECURITIES, NOR DOES IT CONSTITUTE A SOLICITATION OF AN OFFER TO INVEST IN OR OTHERWISE PURCHASE DEBT OR EQUITY OF THE COMPANY. SUCH OFFERINGS CAN BE MADE ONLY TO PERSONS WHO QUALIFY AS "ACCREDITED INVESTORS" (AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT OF 1933, AS AMENDED) BY DELIVERY OF THE APPROPRIATE SUBSCRIPTION MATERIALS (SUBSCRIPTION MATERIALS). THESE MATERIALS ARE FOR INFORMATIONAL PURPOSES ONLY.

THIS SUMMARY CONTAINS CONFIDENTIAL INFORMATION REGARDING THE COMPANY AND ITS PRODUCTS AND BUSINESS. BY ACCEPTING AND/OR REVIEWING THIS SUMMARY THE RECIPIENT AGREES THAT THIS SUMMARY WILL BE USED ONLY TO EVALUATE A POTENTIAL INVESTMENT IN THE COMPANY AND FOR NO OTHER PURPOSE. RECIPIENT AGREES NOT TO DIVULGE ANY NON-PUBLIC INFORMATION CONTAINED HEREIN TO ANY OTHER PARTY, OTHER THAN TO RECIPIENT'S LEGAL AND FINANCIAL ADVISORS IN CONNECTION WITH THE EVALUATION OF A POTENTIAL INVESTMENT, AND RECIPIENT FURTHER AGREES TO RETURN THIS SUMMARY, TOGETHER WITH ANY COPIES THEREOF, TO THE MANAGEMENT OF THE COMPANY UPON REQUEST.

THE INFORMATION CONTAINED IN THIS SUMMARY, INCLUDING ANY ESTIMATES AND PROJECTIONS CONTAINED HEREIN OR WHICH MAY OTHERWISE BE DELIVERED BY THE COMPANY TO A PROPOSED INVESTOR, HAVE BEEN PREPARED BY MANAGEMENT OF THE COMPANY AND INVOLVE SIGNIFICANT ELEMENTS OF SUBJECTIVE JUDGMENT AND ANALYSIS WHICH MAY OR MAY NOT BE CORRECT. NEITHER THE COMPANY NOR ITS MANAGEMENT, ADVISORS OR CONSULTANTS MAKE ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS SUMMARY, NOR OF ANY OTHER WRITTEN OR ORAL COMMUNICATIONS TRANSMITTED TO THE RECIPIENT OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN THE COURSE OF DISCUSSING ANY POTENTIAL TRANSACTION WITH THE COMPANY. NOTHING CONTAINED HEREIN IS, OR SHALL BE RELIED UPON BY RECIPIENT AS, A PROMISE OR REPRESENTATION BY THE COMPANY OR ITS MANAGEMENT OR ANY OF ITS REPRESENTATIVES, WHETHER AS TO THE PAST OR THE FUTURE. ONLY THOSE REPRESENTATIONS OR WARRANTIES WHICH ARE MADE IN A FINAL DEFINITIVE AGREEMENT REGARDING AN INVESTMENT AND/OR AN ACQUISITION OF AN EQUITY INTEREST IN THE COMPANY WHEN, AS AND IF EXECUTED, AND SUBJECT TO THE LIMITATIONS AND RESTRICTIONS AS MAY BE SPECIFIED THEREIN, WILL HAVE ANY LEGAL EFFECT.

# Disclaimer and Confidentiality, cont.

THE PURCHASE OF ANY SECURITIES OFFERED HEREBY ENTAILS A HIGH DEGREE OF RISK.  NO INVESTMENT IN ANY SECURITIES OFFERED HEREBY SHOULD BE MADE BY ANY PERSON WHO IS NOT IN A POSITION TO LOSE THE ENTIRE AMOUNT OF SUCH INVESTMENT.  ALL INVESTORS SHOULD CAREFULLY REVIEW THIS SUMMARY.

THE INDUSTRY, MARKET AND COMPETITIVE POSITION DATA USED THROUGHOUT THIS EXECUTIVE SUMMARY WAS OBTAINED FROM OUR OWN RESEARCH, SURVEYS OR STUDIES CONDUCTED BY THIRD PARTIES AND INDUSTRY OR GENERAL PUBLICATIONS. INDUSTRY PUBLICATIONS AND SURVEYS GENERALLY STATE THAT THEY HAVE OBTAINED INFORMATION FROM SOURCES BELIEVED TO BE RELIABLE, BUT DO NOT GUARANTEE THE ACCURACY AND COMPLETENESS OF SUCH INFORMATION. WHILE WE BELIEVE THAT EACH OF THESE STUDIES AND PUBLICATIONS IS RELIABLE, WE HAVE NOT INDEPENDENTLY VERIFIED SUCH DATA AND WE MAKE NO REPRESENTATIONS AS TO THE ACCURACY OF SUCH INFORMATION. SIMILARLY, WE BELIEVE OUR INTERNAL RESEARCH IS RELIABLE BUT IT HAS NOT BEEN VERIFIED BY ANY INDEPENDENT SOURCES. NO PERSON HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS OR GIVE ANY INFORMATION WITH RESPECT TO THE COMPANY OTHER THAN THE INFORMATION CONTAINED HEREIN.  NEITHER THE DELIVERY OF THIS SUMMARY NOR ANY SALE MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN A CHANGE IN THE MATTERS DISCUSSED HEREIN SINCE THE DATE SET FORTH ON THE INITIAL PAGE OF THIS SUMMARY.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS SUMMARY AS LEGAL, BUSINESS OR TAX ADVICE.  IN MAKING AN INVESTMENT DECISION PROSPECTIVE INVESTORS SHOULD RETAIN THEIR OWN PROFESSIONAL ADVISORS TO REVIEW AND EVALUATE THE ECONOMIC, TAX, LEGAL AND OTHER CONSEQUENCES OF INVESTING IN THE COMPANY, AND ARE NOT TO CONSTRUE THE CONTENTS OF THIS SUMMARY OR ANY OTHER INFORMATION FURNISHED BY THE COMPANY AS LEGAL, FINANCIAL OR OTHER ADVICE. THE SECURITIES WHICH MAY BE OFFERED TO RECIPIENT HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.  FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

# Disclaimer and Confidentiality, cont.

THE COMPANY IS AT AN EARLY STAGE OF ITS DEVELOPMENT AND ITS SECURITIES MAY ONLY BE APPROPRIATE FOR LONG-TERM INVESTMENT.  AN INVESTOR SHOULD PURCHASE COMPANY SECURITIES ONLY IF THAT INVESTOR CAN AFFORD TO LOSE THE ENTIRE INVESTMENT.  THE FORWARD-LOOKING STATEMENTS CONTAINED IN THIS PRESENTATION ARE MADE ONLY AS OF TODAY, AND NEITHER THE COMPANY NOR ITS MANAGEMENT IS UNDER ANY OBLIGATION TO REVISE OR UPDATE THESE FORWARD-LOOKING STATEMENTS.

# Executive Summary

- 875 Holdings, LLC ("875" or the "Company") will develop and apply a alternative factoring model to the live events business – concerts, theater, sports, museums, etc. – taken together these sectors represent over $20bn in annual ticket sales.

- The 875 model provides a vital, highly attractive new source of capital to markets where there are very few serious and focused financiers.

- The model is very simple and very transparent – 875 will purchase blocks of tickets to live events, in most cases from an event sponsor (promoter, team, venue, etc.) in advance of an event, and be repaid when those tickets are sold to secondary market brokers in bulk or directly to the fans who attend the event.

- Ticket portfolios are self-liquidating with known maturities.

- It is anticipated that 875 will deliver returns to its equity holders of in excess of 20% per annum.

- The 875 management team possesses a deep and very unique mix of live event promotion, ticketing, and entertainment finance experience.

# Executive Summary, cont.

- 875 provides a vital new source of capital to Event Sponsors:

  - There are currently very few financiers with a specific focus on and understanding of the full breadth of the live events business;

  - Of the entities that do exist, they are either acting as a lender (subject to an ongoing drought in credit and all of the encumbrances involved in new loan origination) or equity investors looking to own a permanent stake in the event; and

  - 875 offers a alternative solution with a number of very attractive qualities:

    - The 875 principals have a deep, focused understanding of the live events business;
    - Diligence requirements are much simpler than with traditional bank or mezzanine borrowing – typically limited to analysis of historical ticket sales and where applicable, to understanding cancellation risk;
    - Typically, the cost of capital to the Seller will be analogous with mezzanine debt (absent loan origination fees) or with existing systems of discounts in place (e.g., group sales), rather than with a sale of equity;
    - The Event Sponsor's assets are neither pledged nor encumbered by the transaction; and
    - For Sponsors with debt facilities in place, the transaction is permissible within all standard loan covenants.

# Ticket Acquisition Strategy

- 875 will target ticket acquisitions in four primary categories of live entertainment:

| Segment | Parameters | Market Size Statistics (Annual Ticket Sales $) | Examples |
|---|---|---|---|
| Concert Tours | National & International tours featuring top 100 touring acts | $2.5bn gross ticket sales for top 100 tours | Grateful Dead<br>Prince<br>Metallica |
| Broadway Musicals | Performing on Broadway in NYC & in other major markets | ~$500mm (New York only) | Book of Mormon<br>Spiderman |
| Sports | Season tickets for MLB, NFL, NBA, NHL, top 50 NCAA football & basketball | $4.4bn (NFL, NBA, MLB, NHL only) | Boston Celtics<br>St. Louis Rams<br>Ohio State Football |
| General Admission | Theme Parks, Museums, Music Festivals, Auto Shows, Ski Area Lift Tickets | $25mm (New York MOMA)<br>$800mm (Six Flags Gate)<br>$287mm (Vail Resorts lift tix) | New York MOMA<br>Six Flags<br>Detroit Auto Show |

## Ticket Acquisition Strategy, cont.

- It is expected that 875 will enter into an agreement to purchase an allocation of tickets to an upcoming event or series of events, in most cases from an "Event Sponsor" (typically a promoter, producer, venue, or team). In certain other cases, the tickets may be purchased in an arms length transaction (or transaction more favorable to the Company) from an entity or individual which may be affiliated with the Company, but which itself purchased the tickets from an Event Sponsor.

- A typical purchase agreement for an allocation of tickets will specify a purchase price which represents a discount to the anticipated sale price of the tickets (typically, the face value), and in some circumstances tickets will be purchased at face value or a small premium. These instances would only be for premium seating for "hot" events (e.g. tickets in the first 10 rows for The Grateful Dead concert), anticipated to be resold in the secondary market in advance of the performance at a significant premium.

- Additionally, a ticket allocation purchase agreement may specify other terms of the transaction including:
    - The sequence in which the covered tickets will be sold (e.g., in priority to all other tickets for the event, or at a fixed point in the overall sequence);
    - Terms on which the covered tickets will be sold (e.g., under the event sponsor's existing agreements with Ticketmaster, venues, etc. or under separate sales agreements entered into by 875);
    - Restrictions on the event sponsor's use of the transaction proceeds, as needed to provide protection against event cancellation risk; and
    - Where possible, enhancements such as a right to "rollover" unsold ticket inventory when an event has passed for new tickets to a future event (providing principal protection).

# Ticket Acquisition Criteria *(cont.)*

- **No Cancellation Risk** – 875 will not agree to bear the economic risk of an event cancellation (subject in certain cases to service charges which may be imposed by the Sales Agent) . In the event of a cancellation, 875 will require that the purchased tickets be honored if the event is rescheduled, that the Event Sponsor refund the full purchase price; and/or that acceptable insurance arrangements are in place that will cover the purchased inventory and any expense involved to process ticket refunds.

- **Enhancements** – 875 may in certain transactions be able to improve the risk profile of a ticket purchase transaction by agreeing to certain parameters with the Event Sponsor. For example:

    - 875's inventory be required to be sold in priority to the Event Sponsor's own inventory (or otherwise at a defined point in a sequence);

    - 875 shall retain a right of approval over any changes to the pricing or other terms of sale of the Event Sponsor's own remaining inventory;

    - 875 shall be permitted to bundle certain "VIP" elements with its own inventory to support sales and/or premium pricing; and

    - Ticket purchase agreements may stipulate that any unsold tickets at the time of an event can be exchanged for new tickets for a future event (providing principal protection & limiting risk to timing).

# Criteria Relating to Events and Ticket Acquisitions

- **Certainty of Demand** – Demand for tickets to future events will be established by reference to sales data for previous or otherwise comparable events made available by the event sponsor (promoter, team, producer, venue) or otherwise available to 875.

- **Certainty of Timing** – The timing of sales and cash remittances will be determined by consideration of a number of factors, including the date of the event(s), the terms on which the Agent remits cash to the ticket owner, and the nature of the event.

- **Marketing Plan** – Where appropriate, 875 will require that the event sponsor demonstrate to its satisfaction that it has a suitable plan in place to promote and market an event including, where applicable, an appropriate marketing budget.

## Sales of Tickets Acquired by 875

- 875 may sell tickets it acquires to secondary market brokers in bulk, directly to the fans who attend the event or through qualified sales agents. Sales Agents for tickets acquired by 875 may include (a) the Event Sponsor (for those entities with their own box office operations, such as sports franchises and theme parks), or (b) Ticketmaster or a comparable ticket seller, or a premium ticket seller such as StubHub (owned by Ebay) or TicketsNow (owned by Ticketmaster).   875 will generally require that its Sales Agents provide reporting no less frequently than weekly (in most cases real-time reporting is available) and consent to audits on a regular basis.

- In certain instances, 875 may sell its rights to acquire tickets to an event, rather than selling the tickets themselves.

# 875 Structure and Management Team

- 875 is a Delaware limited liability company with two classes of membership interests, "Class A Interests" and "Class B Interests".   Holders ("Class B Members") of the Class B Interests will not be involved in the management or operations of 875, and will have the right to vote only in very limited circumstances with respect to certain extraordinary events

- 876 will be managed by its managing member, holder of the Class A Interests,  JTBS Holdings, LLC ("JTBS"), and the 875 management committee, as appointed by JTBS.  The management committee has two members, Joseph Meli and Matthew Harriton:

   **Joseph Meli** is a principal of 127 Holdings, LLC, a media investment holding company.  Previously, he was the founder and CEO of Bulldog Entertainment Group, a VIP ticketing business and operator of private / VIP concerts.  Bulldog was a pioneer in the development of VIP concert experiences for corporate clients and loyalty program managers, creating experiences with artists including Madonna, U2, The Rolling Stones, and Justin Timberlake for clients such as Merrill Lynch Visa Signature, American Express Centurion, MasterCard, and hundreds of corporate clients.  Warner Music Group acquired Bulldog in May 2007, at which point Joe joined WMG as Senior VP of US Recorded Music and CEO of Bulldog, a portfolio company in WMG's 360 Group, a position he held until June 2008 when WMG scaled back its efforts in live music and other ancillary businesses to focus on challenges in its core recorded music business.  Prior to Bulldog, Joe was a founding partner, with Peter Arnell and Steve Stoute, of PASS Entertainment, an entertainment marketing company that was later sold for $8mm.  Joe began his career in the Investment Banking Division of Credit Suisse, and holds a BA from the University of Utah.

   **Matthew Harriton**  has a broad range of experience in finance and operations. Over the past 28 years Matthew acquired a broad business background across a range of industries. He started his career in accounting and operations at The First Boston Corporation and was responsible for several back office automation procedures that greatly increased worker productivity. He also helped develop data base management systems to monitor daily trading and settlement activities. After graduate school, Matthew joined the Mergers and Acquisitions group at Coopers & Lybrand where he gained experience in a variety of transactions including, but not limited to, sale, purchase, merger, reorganization, valuation, and recapitalization of companies. He also helped create and manage the sell-side practice of the group, specializing in monetizing the business assets of small to mid-sized businesses. In 1994, Matthew joined the Argosy Group, a boutique investment bank, specializing in high yield private placement. Matt participated in multiple transactions that included live entertainment, hospitality, health care, basic manufacturing, and professional sports, assisting clients in structuring and raising capital. Since 1997, Matthew has focused on more entrepreneurial interests founding, funding, and operating a start-up and several early stage companies in the fields of live entertainment, commodities, telecommunications, medical device development and manufacture, hospitality, consumer packaging, and entertainment. He has served as an officer and director of multiple public companies and has experience with respect to SEC compliance, FDA compliance, intellectual property rights, and operations and administration of operating entities. Matthew has a BS in Finance from Lehigh University and an MBA from Duke's Fuqua School of Business.

# Economics of the Investment

- **Class B Interests** – 875 intends to take capital contributions from accredited investors, and issue to these investors Class B Interests in 875. Below is a summary of the economic and other general terms of the Class B Interests (the following is not all inclusive; please refer to the limited liability company agreement of 875 for full details):
    - Subject to tax distributions discussed below, 100% of all profits of 875 will be allocated (pro rata, based on investments in 875) to the holders of Class B Interests ("Class B Members") to the extent equal to a 15% annual rate of return based on invested capital of Class B Members ("Class B Investments");
    - thereafter, 80% of each incremental dollar of profits will be allocated to the Class B Members until they receive an additional 5% annual rate of return on Class B Investments; and
    - thereafter, 20% of all other incremental profit will be allocated to the Class B Members.
    - Notwithstanding the allocations of profits above, distributions may first be made to all members of the Company in an amount not less than that required to satisfy each Member's estimated federal and state tax obligations arising as a result of the ownership thereby of the Interests, based on an assumed tax rate of forty-five (45%) percent ("Tax Distributions") for the relevant fiscal year arising as a result of the ownership thereby of Interests.
    - Distributions of available cash shall be made by 875 annually, or at such more frequent times as determined by 875 management.
    - There shall be no management fee payable to 875's managers or managing member.
    - Each Class B Member shall have the right to put all or any portion of its Class B Interests back to 875 only following the eighteen month anniversary of the effective date of the limited liability company agreement of 875, upon not less than 120 days prior notice to 875, for a redemption price equal to shall be the amount of such Class B Member's 875 capital account as of the date of such redemption.
    - Class B Members shall have no involvement in the management or operation of 875, and shall have a vote only in very limited circumstances with respect to certain extraordinary events.

# Sales Through Broker-Dealers

- In certain cases, the Class B Interests will be sold to accredited investors through a registered broker-dealer.  The Company and the holder of the Company's Class A Interests JTBS Holdings, LLC ("JTBS") intend to enter into a placement agreement with TriPoint Global Equities, LLC ("TGE"),  a registered broker-dealer.  It is expected that this placement agreement will provide that TGE will be appointed as a non exclusive placement agent of the Company, for a twelve month period, to arrange, on behalf of the Company, on a best efforts basis, sales of Class B Interests to accredited investors identified by TGE.

- As consideration for the arrangement of sales of Class B Interests to persons and entities identified by TGE, the Company shall pay TGE a cash placement fee equal to 5% on any gross proceeds received by the Company in connection with any such sale. This cash placement fee shall be paid by wire transfer on the closing date on which the Company receives such aggregate consideration.

- As additional compensation for the services to be rendered by TGE under this Agreement, (i) for the life of the Company, following an investment in the Company or an affiliate of the Company by an entity or individual identified to the Company by TGE, JTBS shall pay to TGE a fee equal to seven and one half percent (7.5%) of the Company's performance allocation or distribution to the Class A Members of the Company, or similar fees, attributable to Interests held by such investor so identified to the Company by TGE.

# Illustrative Return Analysis

**875 Holdings, LLC**
*Iluustrative Return Analysis*

| Assumptions: | | | |
|---|---|---|---|
| Average profit per transaction | 40% | | |
| Total Investment | $ 3,000,000 | | |

| Number of Investments per Annum | 1 | 2 | 3 |
|---|---|---|---|
| 15% preference | $ 450,000 | $ 450,000 | $ 450,000 |
| 5% additional preference | $ 150,000 | $ 150,000 | $ 150,000 |
| 20% incremental carry | $ 112,500 | $ 448,500 | $ 918,900 |
| Total Profit to Calss B | $ 712,500 | $ 1,048,500 | $ 1,518,900 |
| Annualized Return to Class B | 24% | 35% | 51% |

The statements contained in this forecasted financial information are forward looking statements that involve a number of risks and uncertainties. There are numerous factors that could cause actual results to differ materially from those that have been forecasted.