Steven W. Klutkowski, Esq.
**DUKE, HOLZMAN, PHOTIADIS & GRESENS LLP**
Attorneys for Plaintiffs
701 Seneca Street, Suite 750
Buffalo, New York 14210
Tel.: (716) 855-1111

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

I.B. TRADING, INC.
711 3rd Avenue, 6th Floor
New York, New York 10017

IAN BEHAR
711 3rd Avenue, 6th Floor
New York, New York 10017

JORON MANAGEMENT, LLC
640 Ellicott Street, Suite 108
Buffalo, New York 14203

JORDAN LEVY
640 Ellicott Street, Suite 108
Buffalo, New York 14203

THOMAS MACEY AND
ELIZABETH MACEY, Individually and
as Tenancy by the Entirety
1301 Thatch Palm Drive
Boca Raton, Florida 33432

FUSION CAPITAL LLC
711 3rd Avenue, 6th Floor
New York, New York 10017

RYAN SASSON
711 3rd Avenue, 6th Floor
New York, New York 10017

ROBERT KOLTUN
1075 Park Avenue, Apt. 2
New York, New York 10128

**FIRST AMENDED COMPLAINT AND JURY DEMAND**
**(CORRECTED)**

Civil No. 1:17-cv-01962

ECF CASE

ARTHUR LUXENBERG
11 Jordan Drive
Great Neck, New York 11021

Plaintiffs,

v.

TRIPOINT GLOBAL EQUITIES, LLC
1450 Broadway, 26th Floor
New York, New York 10018

ROBERT NATHAN
1450 Broadway, 26th Floor
New York, New York 10018

MARK H. ELENOWITZ
1450 Broadway, 26th Floor
New York, New York 10018

MICHAEL BOSWELL
1450 Broadway, 26th Floor
New York, New York 10018

Defendants.

---

Plaintiffs I.B. TRADING, INC., IAN BEHAR, JORON MANAGEMENT, LLC, JORDAN LEVY, THOMAS MACEY AND ELIZABETH MACEY, Individually and as Tenancy by the Entirety, FUSION CAPITAL LLC, RYAN SASSON, ROBERT KOLTUN, and ARTHUR LUXENBERG ("Plaintiffs"), by their attorneys, Duke, Holzman, Photiadis & Gresens LLP, for their complaint against Defendants TRIPOINT GLOBAL EQUITIES, LLC, ROBERT NATHAN, MARK H. ELENOWITZ, and MICHAEL BOSWELL ("Defendants"), allege upon knowledge as to themselves, and upon information and belief as to all other matters, as follows:

**PARTIES**

1. At all times hereinafter mentioned, Plaintiff I.B. Trading, Inc. ("I.B. Trading") was

a domestic business corporation organized and existing under the laws of New York, with its principal place of business at 711 3rd Avenue, 6th Floor, New York, New York 10017.

2. Plaintiff Ian Behar ("Behar") is a natural person with an office at 711 3rd Avenue, 6th Floor, New York, New York 10017.

3. Behar is the principal and manager of I.B. Trading.

4. At all times hereinafter mentioned, Plaintiff JoRon Management, LLC ("JoRon") was a domestic limited liability company organized and existing under the laws of New York, with its principal place of business at 640 Ellicott Street, Suite 108, Buffalo, New York 14203.

5. Plaintiff Jordan Levy ("Levy") is a natural person with an office at 640 Ellicott Street, Suite 108, Buffalo, New York 14203.

6. Levy is the principal and manager of JoRon.

7. At all times hereinafter mentioned, Plaintiff Fusion Capital, LLC ("Fusion") was a domestic limited liability company organized and existing under the laws of New York, with its principal place of business at 711 3rd Avenue, 6th Floor, New York, New York 10017.

8. Plaintiff Ryan Sasson ("Sasson") is a natural person with an office at 711 3rd Avenue, 6th Floor, New York, New York 10017.

9. Sasson is the principal and manager of Fusion.

10. Plaintiffs Thomas Macey and Elizabeth Macey are natural people who reside in Boca Raton, Florida. Plaintiffs Thomas Macey and Elizabeth Macey are married and conducted business relevant to this dispute as Tenancy by the Entirety. Plaintiff Thomas Macey ("Macey") manages the Tenancy by the Entirety.

11. Plaintiff Robert Kulton ("Kulton") is a natural person who resides in New York,

New York.

12. Plaintiff Arthur Luxenberg ("Luxenberg") is a natural person who resides in Nassau County, New York.

13. Prior to the events resulting in this lawsuit, as well as all times hereinafter mentioned, Plaintiffs were a group of business associates and companies who invested together.

14. Upon information and belief, at all times hereinafter mentioned, Defendant Tripoint Global Equities, LLC ("Tripoint"), was and is a limited liability company organized and existing under the laws of Maryland with its principal place of business at 1450 Broadway, 26th Floor, New York, New York.

15. Tripoint is registered to conduct business in the State of New York.

16. Tripoint is registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer.

17. According to its website (http://www.tripointglobalequities.com), Tripoint "is a global investment bank focused on assisting fast growing companies"; are "specialists dedicated to helping small and mid-cap companies access U.S. capital markets and achieve their growth objectives"; and "are pioneers in equity crowdfinance." Among other things, Tripoint specializes in "a full suite of services" and "advisory services," "banking," "private investments," "private equity," and "sales and trading."

18. Upon information and belief, Defendant Robert Nathan is a natural person that resides and has a professional office in New York, New York.

19. At all times hereinafter mentioned, Nathan was a "Director" of Tripoint's "Specialty Finance Group."

20. Nathan holds himself out as follows on Tripoint's webpage (http://www.tripointglobalequities.com):

> With over 20 years in the industry, Mr. Nathan brings his vast network of clients and expertise with him to TriPoint joining the firm in 2015. He focuses on raising Debt, Equity and Mezzanine Financing for emerging growth companies in the Technology and Healthcare sectors. These companies have sub $500 million valuations and the offerings range in size from $3 to $20 million. His clients include family offices, private equity firms, hedge funds and high net worth individuals, among others. Prior to joining TriPoint, he served as Senior Vice President at Monarch Capital Group. Mr. Nathan is a graduate of Ithaca College. He holds Series 7 & 63 licenses.

21. Upon information and belief, Defendant Mike Boswell ("Boswell") is a natural person having a residence and professional office in New York, New York.

22. At all times hereinafter mentioned, Boswell was a founder of Tripoint and its President, Chief Operating Officer, and Chief Compliance Officer.

23. Boswell holds himself out as follows on Tripoint's webpage (http://www.tripointglobalequities.com):

> Mr. Boswell is co-founder, President, Chief Operating Officer and Chief Compliance Officer of the firm. He is also a Managing Director of TriPoint Capital Advisors, LLC, a merchant banking and financial consulting affiliate of TriPoint Global Equities. Mr. Boswell provides high-level financial services to start-up businesses and small to mid-sized companies, including holding executive and CFO positions with client companies. With TriPoint Capital Advisors, he has assisted numerous companies by advising them on corporate finance, corporate structure, corporate governance, mergers and acquisitions, SOX 404 compliance, implications of various SEC rules and FASB Emerging Issues Task Force issues as they relate to private placements, SEC reporting and disclosure requirements and employee option programs.
>
> Mr. Boswell is currently CFO of Mission Solutions Group, a privately held defense sector company and General Technologies Corp, a privately held technology company. He was previously CFO of Ocean Smart International and has advised numerous public companies on accounting and valuation issues. Prior to the founding of TriPoint, Mr. Boswell held a number of executive positions

> focusing on business development and management consulting. He also spent eight years as a senior analyst and senior engineer. Mr. Boswell earned a M.B.A. from Johns Hopkins University and a B.S. degree in Mechanical Engineering from University of Maryland. He holds the Series 24, 62, 63, 79, 82 and 99 licenses.

24. Upon information and belief, Defendant Mark H. Elenowitz is a natural person having a residence in Nassau County, New York, and professional office in New York, New York.

25. At all times hereinafter mentioned, Elenowitz was a founder of Tripoint and its Chief Executive Officer ("CEO").

26. Elenowitz holds himself out as follows on Tripoint's webpage (http://www.tripointglobalequities.com):

> Mr. Elenowitz is responsible for the overall corporate development of the firm and advising clients on structuring, financings and acquisitions. He has extensive experience in advising clients on SOX 404 compliance, employee option programs, and capital markets navigation including acting as a member of the board of directors. For over 24 years he has worked with numerous public and private companies.
>
> Mr. Elenowitz integrates a strong, successful entrepreneurial background with extensive financial services and capital markets experience. He has assisted numerous companies in a "soup-to-nuts" process, preparing them for life as a public company and advising them on an ongoing basis as to further rounds of financing, strategic acquisitions and a broader investor base via a listing on a higher securities exchange or market. He is an expert in capital markets investigative analysis of trading activity, short selling and market activity providing investigative services for Board of Directors, Special Committees and public companies. Mr. Elenowitz also serves as an expert witness in FINRA arbitrations and court actions.
>
> Mr. Elenowitz is also Managing Director of TriPoint Capital Advisors, LLC, a merchant banking and financial consulting affiliate of TriPoint Global Equities. He is the recipient of several entrepreneurial awards and has been profiled in BusinessWeek and CNBC, as well as several other publications. He is a graduate of the University of Maryland School of Business and Management with a B.S. in

Finance. He holds Series 24, 62, 63, 79, 82 and 99 licenses.

27. Elenowitz and Boswell solely make up Tripoint's "Executive Team"; as such, Elenowitz and Boswell are responsible for Tripoint's operations and day-to-day activities.

28. At all times hereinafter mentioned, Boswell, as Tripoint's co-founder, President, Chief Operating Officer, Chief Compliance Officer, and member of the Executive Team, and Elenowitz, as Tripoint's co-founder, Chief Executive Officer, and member of the Executive Team, controlled Tripoint and Nathan by virtue of their key positions at Tripoint and their authority over Tripoint's operations and Nathan's employment. As such, Elenowitz and Boswell were each a "controlling person" and individually liable for the acts of Tripoint and Nathan under Section 20(a) of the Securities and Exchange Act of 1934.

29. At all times hereinafter mentioned, Nathan, Boswell, and Elenowitz were agents of Tripoint. As such, Tripoint is vicariously liable for the wrongful conduct of Nathan, Elenowitz, and Boswell.

## JURISDICITION AND VENUE

30. This Court has jurisdiction pursuant to Section 27 of the Securities and Exchange Act (15 USCS § 78aa(a)), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

31. Venue is proper in this District pursuant to Section 27 of the Securities and Exchange Act (15 USCS § 78aa(a)) and 28 U.S.C. § 1391.

## BACKGROUND

### I. The Ponzi Scheme

32. Joseph Meli ("Meli") and Matthew Harriton ("Harriton"), and companies they formed, owned, controlled, and managed, including 875 Holdings, LLC, 127 Holdings, LLC,

Advance Entertainment, LLC ("Advance Entertainment"), and Advance Entertainment II, LLC ("Advance Entertainment II")(collectively, the "Ponzi Dealers"), participated in a fraudulent ticket investment scheme pursuant to which they raised millions of dollars from investors for purported investments in ticket reselling enterprises involving live events including theatrical performances and concerts.[1]

33. The Ponzi Dealers represented that they would and did purchase large blocks of tickets for popular concerts and musicals and resell the tickets on the secondary market at a profit for their investors. The Ponzi Dealers represented that tickets would be, and were, purchased under ticket supply agreements they made with producers, sponsors, and other industry insiders involved in operating and selling the live events.

34. Contrary to the Ponzi Dealers' representations, they did not have agreements for the purchase of tickets that they could resell on the secondary market, and only a small portion of investor funds, if any, were used to make ticket-related purchases. Instead, the investments were misappropriated for the Ponzi Dealers' personal use and to provide purported investment returns to earlier investors with the Ponzi Dealers to keep the fraudulent scheme ongoing.

**A. 875 Holdings LLC**

35. At all relevant times, 875 Holdings, LLC ("875 Holdings") was a company that the Meli and Harriton used to carry out the fraudulent ticket scheme.

36. At all relevant times, 875 Holdings was managed by Meli and Harriton.

---

[1] This "Ponzi Scheme" is the subject of a pending (1) criminal complaint, United States v. Simmons and Meli, 17 MAG 647 (S.D.N.Y. 2017), and (2) SEC lawsuit, SEC v. Meli, Harriton, et al., 1:17-cv-00632 (S.D.N.Y. 2017). The herein allegations regarding the Ponzi Dealer's scheme includes information from the criminal and SEC matters.

37. At all relevant times, Harrington controlled and owned an 80% interest (through two intermediary LLCs) in 875 Holdings.

38. 875 Holdings represented to investors that it would and did use investor funds to purchase blocks of tickets to live events, primarily through agreements it would and did negotiate with the operators of those events pursuant to its unique industry knowledge, experience, and contacts, and resell those tickets on the secondary market for a profit.

39. Contrary to the 875 Holdings' representations, it did not enter ticket supply agreements to purchase tickets, and only a small portion of investors' money, if any, was used to purchase tickets to events. Instead, the investments were misappropriated for the personal use of the Ponzi Dealers and to provide purported investment returns to other earlier investors with the Ponzi Dealers to keep the fraudulent scheme ongoing.

**B. <u>Advance Entertainment II, LLC</u>**

40. Advanced Entertainment II was also created and managed by Meli and Harriton to carry out the fraudulent ticket scheme.

41. Meli and Harriton are the direct or indirect owners of Advanced Entertainment II. Meli owns 100% of Advance Entertainment which, in turn, owns an 80% interest in Advance Entertainment II. Harriton directly owns a 20% interest in Advance Entertainment II.

42. Advanced Entertainment II represented to investors that it was created to carry out exclusive investment opportunities to purchase blocks of tickets to specific, targeted high-profile events, such as and including the Broadway musical Hamilton and Adele concerts, primarily through agreements it negotiated with the operators of those events pursuant to its unique industry knowledge, experience, and contacts, and to resell those tickets at a profit.

43. Contrary to the Advanced Entertainment II's representations, it did not enter ticket supply agreements to purchase tickets to events, and only small portion of investors' money, if any, was used to purchase tickets to Hamilton, Adele, or other events. Instead, the investments were misappropriated for the personal use of the Ponzi Dealers and to provide purported investment returns to other earlier investors with the Ponzi Dealers to keep the fraudulent scheme ongoing.

## II. 875 Holdings – Defendants' Solicitations and Misrepresentations to Plaintiffs to Induce Their Investments in the Ponzi Scheme

44. Defendant Robert Nathan ("Nathan"), Director of Defendant Tripoint Global Equities LLC ("Tripoint"), met Plaintiff Ian Behar ("Behar") approximately ten years prior to the events resulting in this lawsuit. Behar and Nathan maintained a friendly personally relationship thereafter. Based on their pre-existing relationship, Nathan knew that Behar was part of an investment group made up of friends, business associates, and companies that commonly invested together.

45. Despite knowing Behar personally for nearly ten years, the 875 Holdings, LLC ("875 Holdings") ticket investment was the first deal for which Nathan solicited investments from Behar and his investment group. Nathan contacted Behar in early December 2015 about the ticket investment opportunity—the Ponzi Scheme, and represented that it was a complete "no brainer" that he believed Behar and his group of investors would be interested in.

46. Behar agreed to meet with Nathan, as a representative of Tripoint, as well as Meli and Harriton, the owners and managers of 875 Holdings, about the ticket investment on behalf of himself and his group of investors—Plaintiffs.

47. In particular, Behar advised Nathan, and Nathan understood, that Behar would be attending the meeting on behalf of himself, his company I.B. Trading, and the group of investors made of Plaintiffs, and that Behar would be providing any information, representations, and materials from the meeting to Plaintiffs. Nathan intended that the information, representations, and materials provided to Behar during the meeting would by conveyed to Plaintiffs in connection with soliciting their investments.

48. Behar indeed conveyed the information, representations, and materials provided by Nathan to Plaintiffs as Nathan intended.

### A. **The Initial Meeting and the Executive Summary**

49. On December 10, 2015, Nathan, Meli, and Harriton met with Behar and Plaintiff Jordan Levy ("Levy") at Behar's office at 225 West 39th Street, New York, New York, to pitch the 875 Holdings ticket investment.

50. Behar and Levy advised Nathan, and Nathan understood, that Behar and Levy were attending the initial meeting on behalf of themselves, their companies--I.B. Trading and Joran Management--and the group of investors made of Plaintiffs, and that Behar and Levy would be providing any information, representations, and materials from the meeting to Plaintiffs. Nathan intended that the information, representations, and materials provided to Behar and Levy during the meeting would by conveyed to Plaintiffs, and was eager to solicit Behar's investment group in this manner.

51. Behar and Levy indeed conveyed the information, representations, and materials provided by Nathan to Plaintiffs as Nathan intended.

#### 1. Oral Misrepresentations

52. At the initial meeting, Nathan, Meli, and Harriton presented the ticket investment as a joint venture and partnership between Tripoint and Nathan, Meli, and their company--875 Holdings--under which 875 Holdings would operate and manage the investment and Tripoint and Nathan, who themselves were investors, would identify and solicit investors to provide the working capital for the business.

53. At the initial meeting, Nathan made clear to Behar and Levy that Tripoint was not merely a placement agent for the ticket investments; rather, Tripoint was partnering with Meli, Harriton, and 875 Holdings. Based on Tripoint's reputation, discussed in more detail below, Tripoint's involvement as a partner led Behar and Levy to believe that the ticket investment had Tripoint's stamp of improvement.

54. At the initial meeting, Nathan, on behalf of himself, Tripoint, and Tripoint's joint venture with Meli, Harriton, and 875 Holdings, made the following false statements to Behar and Levy:

a. Nathan advised Behar and Levy that the ticket investments were extremely safe and low risk because they were backed by actual tickets to real events purchased under exclusive ticket purchase agreements that Meli, Harriton, and 875 Holdings had entered with the producers of the shows;

b. Nathan told Behar and Levy that insurance had been procured that would reimburse investors the price of tickets if the event was cancelled; and

c. Nathan represented to Behar and Levy that Tripoint vetted, conducted an investigation, and completed full due diligence related to the ticket investment and the companies offering the investment, and highly recommended it.

55. Upon information and belief, these representations were knowingly false and made for the purpose of inducing Plaintiffs to invest in the fraudulent ticket scheme.

56. In particular, Nathan's representations were false because Meli, Harriton, and 875 Holdings never entered agreements for the purchase of tickets that would be sold on the secondary market for investor profits. Simply, no ticket purchase agreements existed and no tickets were purchased for investment purposes.

57. Nathan's representations were also false because no insurance had been procured that would reimburse investors the price of tickets if the event was cancelled.

58. Nathan's representations were also false because Tripoint did not conduct an investigation and complete due diligence with regard to the ticket investment and the company offering it. If Tripoint would have conducted such an investigation and complete due diligence, it would have discovered obvious red flags and evidence that the ticket investment was a fraud, including that no underlying ticket purchase agreements, actual tickets, or insurance existed.

59. Nathan made the aforementioned false statements with the intent to deceive and manipulate Plaintiffs with regard to the nature and safety of the ticket investments in order to induce Plaintiffs to invest in the ticket-selling enterprise.

60. Nathan made the aforementioned false statements with complete and utter recklessness and disregard for their truth because Nathan and Tripoint failed to review or check the validity of the information regarding the investments presented to Behar and Levy. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

61. Nathan had the motive and opportunity to make misleading and fraudulent statements to induce Plaintiffs invest in the ticket investments because Plaintiffs' investment in

the ticket investments would and did personally and concretely benefit both Nathan and Tripoint. In particular, Nathan's compensation and Tripoint's compensation from the fraudulent ticket investments were directly contingent on the amount of investment dollars that Nathan and Tripoint could secure for the fraudulent ticket investments and the ability to continue the Ponzi Scheme.

2. The Executive Summary Misrepresentations

62. At the initial meeting, Nathan, Meli, and Harriton presented the "875 Holdings, LLC Investment Opportunity Executive Summary" related to the ticket investment (hereinafter, "Executive Summary"). A copy of the Executive Summary is annexed hereto as **Exhibit A**, and the statements therein are incorporated by reference.

63. Each page of the Executive Summary was labeled "875 Holdings, LLC" and "Tripoint Global Equities, LLC," including Tripoint's logo, thus indicating that it was prepared and being presented jointly by both entities.

64. The Executive Summary provided the following representations by Tripoint:

a. The investment "model is very simple and very transparent – 875 will purchase blocks of tickets to live events, in most cases from an event sponsor (promoter, team, venue, etc.) in advance of an event, and be repaid when those tickets are sold to secondary market brokers in bulk or directly to the fans who attend the event."

b. "It is anticipated that 875 will deliver returns to its equity holders of in excess of 20% per annum."

c. "The 875 management team possesses a deep and very unique mix of live event promotion, ticketing, and entertainment finance experience."

d. "There are currently very few financiers with a specific focus on and understanding of the full breadth of the live events business;"

e. "The 875 principals have a deep, focused understanding of the live events

business”;

f. “875 will enter into an agreement to purchase an allocation of tickets to an upcoming event or series of events, in most cases from an “Event Sponsor” (typically a promoter, producer, venue, or team). In certain other cases, the tickets may be purchased in an arms length transaction (or transaction more favorable to the Company) from an entity or individual which may be affiliated with the Company, but which itself purchased the tickets from an Event Sponsor.”

g. “A typical purchase agreement for an allocation of tickets will specify a purchase price which represents a discount to the anticipated sale price of the tickets (typically, the face value), and in some circumstances tickets will be purchased at face value or a small premium. These instances would only be for premium seating for “hot” events (e.g. tickets in the first 10 rows for The Grateful Dead concert), anticipated to be resold in the secondary market in advance of the performance at a significant premium.”

h. “No Cancellation Risk – 875 will not agree to bear the economic risk of an event cancellation (subject in certain cases to service charges which may be imposed by the Sales Agent). In the event of a cancellation, 875 will require that the purchased tickets be honored if the event is rescheduled, that the Event Sponsor refund the full purchase price, and/or that acceptable insurance arrangements are in place that will cover the purchased inventory and any expense involved to process ticket refunds.”

65. The representations made in Tripoint’s and 875 Holdings’ Executive Summary, presented by Nathan, were knowingly false and made for the purpose of inducing Plaintiffs to invest in the fraudulent scheme.

66. In particular, Tripoint’s representations in the Executive Summary were false because Meli, Harriton, and 875 Holdings never entered, or intended to enter, ticket purchase agreements or use investors’ money to purchase tickets for resale on the secondary market.

67. Tripoint’s representations in the Executive Summary presented by Nathan were also false because no insurance had been procured that would reimburse investors the price of tickets if the event was cancelled.

68. If Tripoint would have reviewed, checked, or performed due diligence with regard to the representations made in the Executive Summary bearing Tripoint's name, then Tripoint would have discovered obvious red flags and evidence that the ticket investment was a fraud, including that no underlying ticket purchase agreements or insurance existed.

69. Tripoint made the aforementioned false representations in the Executive Summary presented by Nathan statements with the intent to deceive and manipulate Plaintiffs with regard to the nature and safety of the ticket investments in order to induce Plaintiffs to purchase the ticket investments.

70. Tripoint made the aforementioned false representations in the Executive Summary presented by Nathan with complete and utter recklessness and disregard for the truth of those representations because Nathan and Tripoint failed to review or check the validity information regarding the investments that Nathan represented to Behar and Levy. Alternatively, if any review, evaluation, or due diligence had been performed then the representations in the Executive Summary were knowingly and intentionally false as the entire business was a fictitious sham.

71. Tripoint and Nathan had the motive and opportunity to make misleading and fraudulent statements in the Executive Summary to induce Plaintiffs invest in the ticket investments because Plaintiffs investment in the ticket investments would and did personally and concretely benefit both Nathan and Tripoint. In particular, Nathan's compensation and Tripoint's compensation from the fraudulent ticket investments were directly contingent on the amount of investment dollars that Nathan and Tripoint could secure for the fraudulent ticket investments and the ability to continue the Ponzi Scheme.

72. At the initial meeting and pursuant to the Executive Summary, Plaintiffs were

offered non-management, non-voting “Class B Interests” in 875 Holdings.

73. Class B Interest holders in 875 Holdings were to receive a return on their investment as follows: “100% of all profits of 875 will be allocated (pro rata, based on investments in 875) to the holders of Class B Interests (“Class B Members”) to the extent equal to a 15% annual rate of return based on invested capital of Class B Members (“Class B Investments”); thereafter, 80% of each incremental dollar of profits will be allocated to the Class B Members until they receive an additional 5% annual rate of return on Class B Investments; and thereafter, 20% of all other incremental profit will be allocated to the Class B Members.”

74. The Executive Summary also stated that Tripoint would receive 5% commission on gross proceeds received by 875 Holdings for the sale of investments in the ticket scheme.

75. The expected investment returns in Executive Summary were false, overly inflated, and crafted to appear highly desirable to induce Plaintiffs to invest in the Ponzi Scheme. Indeed, the business was a sham and no profits from selling tickets were expected.

76. Upon information and belief, Nathan’s and Tripoint’s commission as stated in the Executive Summary was knowingly false because they received a greater benefit than they disclosed to Plaintiffs for recommending, advising, and steering Plaintiffs to invest in the fraudulent investment scheme.

**B. <u>Tripoint as a Trusted Investment Advisor</u>**

77. In addition, at the initial meeting, Nathan made the following false statements to Behar and Levy in order to build a relationship of trust and confidence between Nathan and Tripoint and Plaintiffs, to use the Tripoint firm and its reputation to add credibility to the ticket investments and the recommendation to invest, and to induce Plaintiffs to rely on Tripoint’s

superior knowledge, expertise, and advice with regard to the ticket investment and its safety:

a. Nathan touted Tripoint's financial and investment expertise and experience, and advised the Tripoint includes financial staff, a corporate lawyer, and a compliance officer, all with "extensive financial services" experience, including investigative services;

b. Nathan also represented that he grew up and attended high school in Long Island with Harriton and that they had been friends for years;

c. Nathan represented that Tripoint principals had personally invested $1,500,000 of their own money into the ticket investment, including that he had personally invested $250,000 of his own money; and

d. Nathan represented that Meli had already invested $15,000,000 of his own money in the ticket investment and that Harriton had invested $3,000,000 of his own money in the ticket investment.

78. In addition, at the initial meeting, in order to build a relationship of trust and confidence between Nathan and Tripoint and Plaintiffs, and to use the Tripoint firm and its reputation to add credibility to the ticket investments and the recommendation to invest, Nathan urged Behar and Levy to review Tripoint's website to confirm the qualifications of the firm and its expertise and experience.

79. As a result, Behar, Levy, and Plaintiffs did in fact review Tripoint's website in determining whether to follow the advice to invest in the ticket investment. Plaintiffs' review of the Tripoint website, at Nathan's urging, led Plaintiffs to reasonably believe that the advice and information they were being provided regarding ticket investments was coming from a trusted, experienced, and reputable investment firm. In particular, the representations leading to Plaintiffs reasonable belief included that Tripoint was a registered "global investment bank"; that Tripoint is a member of the Finance Industry Regulatory Authority ("FINRA"), the Securities Investor Protection Corporation ("SIPC"), and the Municipal Authorities Rulemaking Board

("MSRB"); that Tripoint provided the "full suite" of financial services, including "advisory services," "compliance advisory services," advice on "SEC Regulatory issues," and "general corporate advisory"; that Tripoint specializes in "private investments"; and that Tripoint's staff, including Nathan, Elenowitz, and Boswell, have decades of investment experience.

80. Furthermore, Nathan's statements regarding Harriton and Nathan's personal relationship, the joint presentation of the Executive Summary with both 875 Holdings' and Tripoint's name on every page, and Nathan's representations that Harriton, Meli, Nathan, and other Tripoint principals all had personally invested in the ticket investments after their own evaluation of the business, led Behar, Levy, and Plaintiffs to reasonably believe that the ticket investments were being offered pursuant to a joint-venture between Meli, Harriton, 875 Holdings, and Tripoint as a legitimate investment opportunity.

### C. <u>The Second Meeting – Further Misrepresentations</u>

81. In mid-December 2015, Behar attended a second meeting concerning the ticket investment at Tripoint's offices in New York, New York, with Nathan and Defendant Mark Elenowitz ("Elenowitz"), Tripoint's founder and CEO.

82. At that meeting, Behar advised Nathan and Elenowitz, and Nathan and Elenowitz understood, that Behar was attending the meeting on behalf of himself, his company I.B. Trading, and the group of investors he represented made up of Plaintiffs. Behar stated and made clear that he would be providing all information, representations, and materials from the meeting to Plaintiffs. Nathan and Elenowitz understood that the information, representations, and materials provided to Behar during the meeting would by conveyed to Plaintiffs, and was eager to solicit Behar's investment group in this manner.

83. Behar indeed conveyed the information, representations, and materials provided by Elenowitz to Plaintiffs.

84. At that meeting, Elenowitz represented to Behar that he and Tripoint had investigated, vetted, and performed due diligence regarding the ticket investment and the company/individuals offering the investment.

85. Elenowitz advised that the investment was a "no-brainer" because the companies in which Plaintiffs would be investing had entered contracts with the shows for the purchase of tickets, that the investments were backed by the physical tickets to the events being purchased with the investment funds, and insurance was in place in case an event for which tickets were purchased was cancelled. Elenowitz represented that Tripoint had conducted a due diligence review to confirm and verify these facts.

86. These representations were knowingly false and made for the purpose of inducing Plaintiffs to invest in the fraudulent ticket scheme.

87. In particular, Elenowitz's representations were false because no agreements existed for the purchase of tickets related to the investment, and no "physical tickets to the events" were ever purchased or actually existed.

88. Elenowitz's representations were also false because no insurance had been procured that would reimburse investors the price of tickets if the event was cancelled.

89. Elenowitz's representations were also false because if he and Tripoint did conducted an investigation and complete due diligence, as Elenowitz represented, they would have discovered obvious red flags and evidence that the ticket investment was a fraud, including that no underlying ticket purchase agreements or insurance existed.

90. Elenowitz made the aforementioned false statements with the intent to deceive and manipulate Plaintiffs with regard to the nature and safety of the ticket investments in order to induce Plaintiffs to purchase the ticket investments.

91. Elenowitz made the aforementioned false statements with complete and utter recklessness and disregard for their truth because Elenowitz and Tripoint failed to review or check the validity of information regarding the investments that Elenowitz represented to Behar. Alternatively, if any review, evaluation, or due diligence had been performed, then Elenowitz's representations were knowingly and intentionally false as the entire ticket business was a fictitious sham.

92. Elenowitz had the motive and opportunity to make misleading and fraudulent statements to Behar to induce Plaintiffs invest in the ticket investments because Plaintiffs investment in the ticket investments would and did personally and concretely benefit both Elenowitz and Tripoint. In particular, Elenowitz's compensation and Tripoint's compensation from the fraudulent ticket investments were directly contingent on the amount of investment secured for the fraudulent ticket investments and ability to continue the Ponzi Scheme. In addition, as Tripoint's owner and founder, Elenowitz directly benefited from Tripoint's success and profits and the ability to continue the Ponzi Scheme.

**D. Pattern of Fraudulent Conduct – The Blank Action**

93. A strong inference of Elenowitz's fraudulent intent with regard to the fraudulent ticket investments is further evidenced by the claims against Elenowitz in Adam Blank, et al. v. TriPoint Global Equities, LLC, Tripoint Capital Advisors, LLC, Mark H. Elenowitz and Michael Boswell (S.D.N.Y 1:17-cv-00876, Hon. Andrew L. Carter, Jr.)(hereinafter, the "Blank Action").

A copy of the Amended Complaint and Jury Demand is in the Blank Action is annexed hereto as **Exhibit B**.

94. The claims and facts in the Blank Action are hereby incorporated by reference. The Blank Action shows that Elenowitz made the same and similar false representations discussed herein to other investors to induce them to invest in the Ponzi Scheme. Elenowitz's false representations identified in the Blank Action include that Elenowitz and Tripoint completed due diligence related to the same ticket investments and the companies offering them, that the ticket investments were conservative and safe because they were backed by the actual tickets, that the offering companies had ticket purchase agreements with the producers of the shows, that insurance was in place that fully covered insurers if an event was cancelled, and that Tripoint principals had personally invested in the ticket investments. (Ex. B., ¶¶ 36 – 43).

**E. <u>Solicitations and Misrepresentations via Teleconference and Email</u>**

95. After the second meeting, prior to investing, in December 2015, Plaintiffs had multiple teleconferences and email communications with Nathan alone and with Nathan and Harriton together regarding the ticket investment. During those calls and correspondence, Nathan made and/or restated the following false representations to Plaintiffs that he knew were untrue, or that were made with reckless disregarded for the truth, in attempt to induce Plaintiffs to invest in the fraudulent ticket scheme:

a. In response to questions regarding Meli, Harriton, and their companies, including 875 Holdings, Nathan advised that Tripoint had analyzed the ticket resale companies' financial statements and business records to ensure that all corporate governance was handled appropriately including ensuring that the operators were handling financial and related issues in a customary and prudent manner;

b. In response to Plaintiff Macey's advisement that he was only interested in a low risk investment, Nathan responded that the ticket investment is very conservative as it is backed by the tickets themselves. Moreover, Nathan represented that insurance coverage was in place to cover the price of purchased tickets if an event was cancelled;

c. Nathan advised that the investment was a "no-brainer" because Tripoint and 875 Holdings had a deep understanding of the event business, key contacts, and were able to acquire "inside" and pre-sale access to the most desirable events;

d. Nathan also confirmed and restated that he grew up with Harriton and personally knew and trusted him, and that Meli, Harriton, himself, and other Tripoint principals had all invested their own money in the deal; and

e. In response Plaintiff Macey's request to review the agreements between 875 Holdings and the event producers under which Nathan represented that 875 Holdings would be purchasing tickets for resale, Nathan stated that Tripoint and 875 Holdings' could not share the agreements because they were highly confidential. Nathan, however, assured Plaintiffs that Tripoint reviewed the agreements and Tripoint was satisfied.

96. As previously stated, these statements were false because no ticket purchase agreements existed, no ticket-related insurance existed, and if Nathan and Tripoint had performed the stated investigation and due diligence, they would have discovered the ticket investment enterprise was a fraud. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

97. Nathan made the aforementioned false statements with the intent to deceive and manipulate Plaintiffs with regard to the nature and safety of the ticket investments in order to induce Plaintiffs to invest in the ticket-selling enterprise.

98. Nathan made the aforementioned false statements with complete and utter recklessness and disregard for their truth because Nathan and Tripoint failed to review or check

the validity of the information regarding the investments presented to Plaintiffs. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

99. Nathan had the motive and opportunity to make misleading and fraudulent statements to induce Plaintiffs invest in the ticket investments because Plaintiffs' investment in the ticket investments would and did personally and concretely benefit both Nathan and Tripoint. In particular, Nathan's compensation and Tripoint's compensation from the fraudulent ticket investments were directly contingent on the amount of investment dollars that Nathan and Tripoint could secure for the fraudulent ticket investments and the ability to continue the Ponzi Scheme.

### F. The Subscription Agreement and Continuing Misrepresentations

100. On December 21, 2015, Nathan emailed Behar, Levy, and Plaintiff Thomas Macey ("Macey") information regarding the ticket investment, including the previously discussed Executive Summary, a Subscription Agreement for Class B Interests of 875 Holdings ("Subscription Agreement"), and 875 Holdings Limited Liability Company Agreement ("875 Holdings LLC Agreement").

101. The Subscription Agreement, which upon information and belief was prepared by Tripoint or with Tripoint's input and assistance, was forwarded to Plaintiffs to assist and further the misrepresentations and to induce Plaintiffs to invest in the Ponzi Scheme.

102. The Subscription Agreement referenced and incorporated the Executive Summary and the 875 Holdings LLC Agreement.

103. The Executive Summary that Nathan again sent to Behar, Levy, and Macey on

December 21, 2015, again included Tripoint's name and logo on every page along with the knowingly false representations previously mentioned.

104. In addition, the 875 Holdings LLC Agreement that Nathan sent to Behar, Levy, Macey on December 21, 2015, falsely represented that the "Purpose" of 875 Holdings was to "acquire and resell, individually and through its subsidiaries, tickets to various events, including concerts, theater, sports, museums, and other events."

105. The representations in the 875 Holdings LLC Agreement presented by Nathan to Behar, Levy, and Macey were false because Meli, Harriton, and 875 Holdings never purchased or entered, or intended to enter, agreements for the purchase of tickets related to the investment.

106. If Nathan or Tripoint would have reviewed, checked, or performed due diligence with regard to the representations made in the 875 Holdings LLC, then they would have discovered obvious red flags and evidence that the ticket investment was a fraud, including that no underlying ticket purchase agreements or insurance existed.

107. Nathan provided Behar, Levy, and Macey the aforementioned false representations in the 875 Holdings LLC Agreement with the intent to deceive and manipulate Plaintiffs with regard to the nature and safety of the ticket investments in order to induce Plaintiffs to purchase the ticket investments.

108. Nathan provided Behar, Levy, and Macey the aforementioned false representations in the 875 Holdings LLC Agreement with complete and utter recklessness and disregard for their truth because Nathan and Tripoint failed to review or check the validity information regarding the investments that Nathan represented to Behar, Levy, and Macey. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly

and intentionally false as the entire business was a fictitious sham.

109. Nathan had the motive and opportunity to promote misleading and fraudulent statements in the 875 Holdings LLC Agreement to induce Plaintiffs invest in the ticket investments because Plaintiffs investment in the ticket investments would and did personally and concretely benefit both Nathan and Tripoint. In particular, Nathan's compensation and Tripoint's compensation from the fraudulent ticket investments were directly contingent on the amount of investment dollars that Nathan and Tripoint could secure for the fraudulent ticket investments and the ability to continue the Ponzi Scheme.

### G. Assurances by Tripoint's Compliance Department

110. Furthermore, as further assurance regarding Tripoint's due diligence and credibility as an investment advisor, Nathan advised Levy and Macey in emails dated December 28, 2015, that "[a]s an SEC regulated Investment Bank," Tripoint had "to comply with FINRA regulations pertaining to Anti Money Laundering and Fraud Prevention," and that the Tripoint's "compliance department" performed a review of the investment documentation and details to ensure compliance with rules "imposed by FINRA to prevent fraud and anti-money laundering."

111. Nathan advised Levy and Macey that Tripoint's Chief Compliance Officer, Defendant Michael Boswell ("Boswell"), was personally performing a compliance review on the investment documentation and details.

112. Nathan forwarded Boswell's emails regarding his anti-fraud compliance review to Levy and Macey dated December 28, 2015, and December 29, 2015. Those emails sent to Levy and Macey showed that a compliance review by Boswell was required before the investments could be placed, that Boswell personally performed a compliance review of the documentation

related to the ticket investments, and that the ticket investment passed Boswell's review.

113. Boswell knew and directed Nathan to forward to Macey and Levy his representations that he performed a fraud-prevention compliance review and that the subject investments passed his compliance review.

114. Boswell knew and understood that Levy and Macey represented the investor group made up of Plaintiffs, and that his representations concerning his fraud-prevention compliance review of the investments would be conveyed to Plaintiffs.

115. Boswell's representations, knowingly forwarded to Plaintiffs by Nathan, were made to further assure Plaintiffs about the safety and suitability of the ticket investments, and to induce Plaintiffs to invest in the Ponzi Scheme.

116. Boswell's statements about his purported compliance review to prevent fraud were knowingly false because, if Boswell would have performed such a review, he would have discovered obvious red flags and evidence that the ticket investment was a fraud and not safe and suitable for Plaintiffs.

117. Nathan and Boswell had the motive and opportunity to make misleading and fraudulent statements to induce Plaintiffs invest in the ticket investments because Plaintiffs investment in the ticket investments would and did personally and concretely benefit both Nathan, Boswell, and Tripoint. In particular, Boswell's compensation, Nathan's compensation, and Tripoint's compensation from the fraudulent ticket investments were directly contingent on the amount of investment secured for the fraudulent ticket investments and keeping the fraudulent scheme going. In addition, as Tripoint's owner and founder, Boswell, directly benefited from Tripoint's success and profits and the ability to continue the Ponzi Scheme.

### H. **Plaintiffs' Investment in 875 Holdings in Reliance on the Fraudulent Misrepresentations and Omissions**

118. Plaintiffs agreed to invest in 875 Holdings in reliance on the advice and recommendations of Tripoint, Elenowitz, Nathan, and Boswell, their superior and unique investment expertise and experience, as touted in aforementioned meetings and on Tripoint's webpage, and the aforementioned false material misrepresentations made by Defendants with the intent to induce Plaintiffs investment, including the false representations made by Nathan during the initial meeting at Behar's office, made by Elenowitz at the subsequent meeting at Tripoint's office, made by Nathan in subsequent phone conferences with Plaintiffs, made in the investment materials emailed by Nathan thereafter, and made by Nathan and Boswell with regard the performance of an anti-fraud compliance review.

119. Each Plaintiff executed the 875 Holdings Subscription Agreement and provided Tripoint other documentation Tripoint requested to complete Plaintiffs' purchases of Class B Interests in 875 Holdings.

120. Once the investment documentation was complete and finalized with the assistance of Nathan and Boswell, Plaintiffs collectively invested a total of $550,000 in 875 Holdings in late December (except for Macey, who invested in February 2016) as follows:

a. Behar/I.B. Trading - $100,000;

b. Levy/JoRon Management - $100,000;

c. Sasson/Fusion Capital LLC - $100,000;

d. Robert Koltun - $100,000; and

e. Macey/Thomas and Elizabeth Macey as Tenancy by the Entirety - $150,000.

121. Thereafter, on January 28, 2016, in response to an inquiry from Levy regarding obtaining Hamilton tickets, Harriton, with a copy to Nathan and Behar, advised, "Things are going well, I sent your administrator an update as I didn't have your email."

122. Nathan knew that Harriton's statement that the investments were "going well" was false or had a complete and utter recklessness and disregard for the truth of that statement. If Tripoint and Nathan performed the represented due diligence and review then they would have known that the ticket enterprise was a fraud. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

123. Nathan allowed Harriton to perpetuate the fraud by misrepresentation that the investments were "going well" because Tripoint, Nathan and his bosses—Elenowitz and Tripoint—were personally benefiting from Plaintiffs' investments in the fraudulent scheme, and Defendants wanted to induce additional investments from Plaintiffs and perpetuate the fraudulent scheme to benefit themselves.

124. By December 2015, through February 2016, Elenowitz and Boswell not only personally and directly participated in soliciting Plaintiffs investments for the Ponzi Scheme, but they were also the cofounders, owners, and top executives of Tripoint. As such, both Elenowitz and Boswell were control persons over Nathan and Tripoint at all such times.

## III. Advance Entertainment II (the Side Pocket Investments) – Defendants' Solicitations and Misrepresentations to Plaintiffs to Induce Their Investments in the Ponzi Scheme

125. After soliciting and obtaining investments for 875 Holdings from Plaintiffs, Nathan solicited Plaintiffs to invest in "Side Pocket" ticket investment opportunities that were also part of the Ponzi Scheme.

126. The Side Pocket investments, Nathan represented, were being offered only and exclusively to 875 Holdings investors. Nathan told Plaintiffs that they had to invest in 875 Holdings in order to be eligible to invest in the Side Pocket investments. According to Nathan, the Side Pocket investments would be through an affiliated special purpose company owned and managed by Meli and Harriton—Advance Entertainment II—and focus specifically on investing in tickets for targeted, highly in-demand events.

127. The first two events for which Nathan was soliciting Plaintiffs' investments were the Broadway production Hamilton and Adele's North American concert tour.

### A. <u>The Solicitation Letter for the Side Pocket Investments</u>

128. On January 27, 2016, Nathan provided Plaintiffs a solicitation letter purportedly authored by Harriton concerning the Side Pocket offerings to 875 Holdings' investors. According to the solicitation letter, the reason that the Side Pocket investments were being offered through Advance Entertainment II, rather 875 Holdings, was because "875 already has significant positions in both and given prudent asset allocation management, we do not feel it wise to increase these positions within 875 until more capital is raised. As such, we are syndicating these two opportunities to existing investors."

129. The solicitation letter stated that the Side Pocket investments "will be for a defined period, repaid including profits on or before November 30, 2016," and will provide a "10% annualized preference to investor" and "50% of any additional upside." The two Side Pocket

investments being offered were "2016 Event 1: Hamilton, NY" and "2016 Event II: Adele North American Tour."

130. The statements in the solicitation letter, which were sent to Plaintiffs by Nathan, were false.

131. In particular, the representations in the solicitation letter that 875 Holdings "already has significant positions in both" Side Pocket investments, that the Side Pocket investments were legitimate ticket selling enterprises, and that the reason that the Side Pocket investments were being offered through a new company for "prudent asset allocation management" purposes were false. In particular, 875 Holdings had not already purchased tickets for Hamilton and Adele shows and Advance Entertainment II was not a legitimate business.

132. Nathan made the aforementioned false statements with the intent to deceive and manipulate Plaintiffs with regard to the nature and safety of the ticket investments in order to induce Plaintiffs to invest in the ticket-selling enterprise.

133. If Nathan or Tripoint would have conducted such an investigation and complete due diligence, as represented, it would have discovered obvious red flags and evidence that the Side Pocket investments were a fraud, including that neither 875 Holdings nor Advance Entertainment II had investments, holdings, or positions in valid and legitimate ticket selling enterprises or businesses, and that the Side Pocket investments were being offered through a newly created company to perpetuate the Ponzi Scheme—not for legitimate business purposes.

134. Nathan made the aforementioned false statements with complete and utter recklessness and disregard for their truth because Nathan and Tripoint failed to review or check the validity of the information. Alternatively, if any review, evaluation, or due diligence had

been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

135. Nathan had the motive and opportunity to make misleading and fraudulent statements to induce Plaintiffs invest in the Side Pocket investments because Plaintiffs investment in the ticket enterprises would and did personally and concretely benefit both Nathan and Tripoint. In particular, Nathan's compensation and Tripoint's compensation from the fraudulent ticket investments were directly contingent on the amount of investment dollars that Nathan and Tripoint could secure for the fraudulent ticket investments and the ability to continue the Ponzi Scheme.

**B. Solicitations and Misrepresentations via Teleconference and Email**

136. After sending the solicitation letter, Plaintiffs had a teleconference with Nathan, on behalf of Tripoint, in early February 2016 regarding the Side Pocket investments during which he continued to make knowing misrepresentation to induce Plaintiffs' investments in the Side Pocket opportunities.

137. Regarding the Hamilton Side Pocket opportunity, in response to Levy's inquiries, Nathan represented that Advance Entertainment II had a contract with the producer of Hamilton to buy 20% of the house seats for every performance so that the producers could use the money to get the Hamilton London and Hamilton road productions started. Nathan represented that the producer of Hamilton needed $7,500,000 for the London production and road shows and was raising the money through this investment.

138. Regarding the Adele Side pocket opportunity, in response to Levy's inquiries, Nathan represented that Advance Entertainment II had a ticket purchase agreement with the

producer of Adele's North American tour, who was funding future concerts.

139. Nathan's statements to Plaintiffs regarding the Hamilton Side Pocket investment and the Adele Side Pocket investment were false because no agreements existed for the purchase of tickets to those events.

140. If Nathan or Tripoint would have conducted such an investigation and complete due diligence, as represented, they would have discovered obvious red flags and evidence that the Side Pocket investments were a fraud, including that Harriton, Meli, and Advance Entertainment II did not have any agreements to purchase Hamilton or Adele tickets.

141. Nathan and Tripoint made the aforementioned false representations regarding the Side Pocket investments with the intent to deceive and manipulate Plaintiffs with regard to the nature and safety of the Side Pocket investments in order to induce Plaintiffs to purchase those investments.

142. Nathan made the aforementioned false representations regarding the Side Pocket investments with knowledge of their falsity or with complete and utter recklessness and disregard for the truth because Nathan and Tripoint failed to review or check the validity information regarding the investments presented to Plaintiffs. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

143. Nathan had the motive and opportunity to make misleading and fraudulent statements to induce Plaintiffs invest in the Side Pocket investments because Plaintiffs investment in the ticket investments would and did personally and concretely benefit both Nathan and Tripoint. In particular, Nathan's compensation and Tripoint's compensation from the fraudulent

ticket investments were directly contingent on the amount of investment dollars that Nathan and Tripoint could secure for the fraudulent ticket investments and the ability to continue the Ponzi Scheme.

144. Nathan also represented that Tripoint was partnering with Advance Entertainment II, Harriton, and Meli to draft the Subscription Agreement for investment in the Side Pocket investments. For example, on February 4, 2016, Nathan emailed Plaintiff Macey providing, "**We** are currently drafting the Subscription Agreement for the Hamilton and Adele Side Deals and we will forward it to you to fill out once shortly." (emphasis added).

145. Nathan's representations led Plaintiffs to reasonably believe, and perpetuated the belief, that the ticket investments had Tripoint's stamp of approval and were being offered through a joint partnership between Tripoint and Harriton, Meli, and their companies.

146. On February 18, 2016, Tripoint emailed Behar and Macey the materials and documents that needed to be completed to invest in the Side Pocket investments, along with instructions. Those emails copied Nathan, Elenowitz, and Boswell, thus evidencing that they were all involved in placing the Side Pocket investments with Plaintiffs.

147. On February 23, 2016, in response to a question from Macey to Nathan regarding why the Side Pocket investments were being offered through Advanced Entertainment II, a new entity formed by Meli and Harriton, rather than through a pre-existing entity they owned and managed, Advanced Entertainment LLC, Harriton provided the following in an email with a copy to Nathan:

> Advance Entertainment, LLC is the personal holding company of Joe Meli. As such it not only held the ticket related inventory but also several of his other investments. To eliminate any confusion and to make tracking and performance results easier to report we

form an SPV, Advance Entertainment II, LLC, to hold only ticket related assets;

We then transferred the ticket related assets for the Adele and Hamilton transaction to the new entity;

148. Those statements were false because no ticket-related assets for Adele and Hamilton actually existed and no such assets were transferred to "the new entity"—Advanced Entertainment II.

149. Nathan and Tripoint, who were copied on Harriton's email, knew that Harriton's explanation was false or had a complete and utter recklessness and disregard for the truth of those statements and failed to review or check the validity of that information.

150. If Nathan or Tripoint would have conducted such an investigation and complete due diligence, as represented, it would have discovered obvious red flags and evidence that the ticket investment was a fraud, including that ticket related assets for the Adele and Hamilton did not exist and were not transferred to Advance Entertainment II. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

**C. <u>The Miami Meeting and Continuing Misrepresentations</u>**

151. On or about February 22, 2016, Levy met Nathan for a meeting in Miami, Florida, to discuss the Side Pocket Investments.

152. At that meeting, Nathan again represented that the ticket investments were extremely safe and desirable because the ticket resale company in which Plaintiffs would be investing had contracts with the producers of Hamilton and the Adele Tour to purchase premium, highly desirable tickets that could be easily sold on the secondary market.

153. At that meeting, Nathan showed Levy agreements on his cell phone that Nathan represented were agreements for Advanced Entertainment II to purchase tickets from the producers of Hamilton and Adele in connection with the Side Pocket investments.

154. Nathan's statements to Levy in Miami were false because no agreements with the producers of Hamilton and Adele existed for the purchase of tickets to Hamilton or Adele.

155. Nathan made the false representations regarding the Side Pocket investments with the intent to deceive and manipulate and induce Levy and Plaintiffs into invest in the Side Pocket investments.

156. Nathan made the aforementioned false representations regarding the Side Pocket investments with knowledge of their falsity or with complete and utter recklessness and disregard for the truth because Nathan and Tripoint failed to review or check the validity of the purported agreements for the purchase of tickets to Hamilton and Adele. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

157. Nathan had the motive and opportunity to make misleading and fraudulent statements to induce Plaintiffs invest in the Side Pocket investments because Plaintiffs' investment in the ticket investments would and did personally and concretely benefit both Nathan and Tripoint. In particular, Nathan's compensation and Tripoint's compensation from the fraudulent ticket investments were directly contingent on the amount of investment dollars that Nathan and Tripoint could secure for the fraudulent ticket investments and the ability to continue the Ponzi Scheme.

158. During the Miami meeting, Levy advised Nathan, and Nathan understood, that

Levy was attending the initial meeting on behalf of himself, his company Joran Management, and the group of investors made of Plaintiffs, and that Levy would be providing any information, representations, and materials from the meeting to Plaintiffs. Nathan intended that the information, representations, and materials provided to Levy during the meeting would by conveyed to Plaintiffs.

159. Levy indeed conveyed the representations provided by Nathan to Plaintiffs as Nathan intended, including that Nathan had showed Levy ticket purchase agreements on his phone.

### D. The Profit Participation Agreement and Continuing Misrepresentations

160. On February 24, 2016, Nathan circulated to Plaintiffs via email a revised Profit Participation Purchase Agreement for investing the Side Pocket investments. The Profit Participation Purchase Agreement again restated the false representation that Advanced Entertainment II would enter "agreements with managers, producer, promoters and other parties having ownership and control of to be issued tickets to various concerts, theatrical performances and other events (each, an "Event")," and that the investors under the Profit Participation Purchase Agreement would have "the right to acquire a participation interest in a portion of the proceeds derived by the [Advanced Entertainment II] from the re-sale of tickets it intends to acquire for a specific Event."

161. Representations in the Participation Purchase Agreement provided to Plaintiffs by Nathan and Tripoint were false because Advance Entertainment II did not intend to, and did not, enter agreements to purchase tickets to events for resale.

162. Nathan made the aforementioned false representations with the intent to deceive

and manipulate Plaintiffs with regard to the nature and safety of the Side Pocket investments in order to induce Plaintiffs to purchase the ticket investments.

163. Nathan made the aforementioned false statements with complete and utter recklessness and disregard for their truth because Nathan and Tripoint failed to review or check the validity of the information regarding the investments that he presented to Behar and Levy. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

164. Nathan had the motive and opportunity to make misleading and fraudulent statements to induce Plaintiffs invest in the ticket investments because Plaintiffs investment in the ticket investments would and did personally and concretely benefit both Nathan and Tripoint. In particular, Nathan's compensation and Tripoint's compensation from the fraudulent ticket investments were directly contingent on the amount of investment dollars that Nathan and Tripoint could secure for the fraudulent ticket investments.

165. The Profit Participation Purchase Agreement for the Side Pocket investments stated that broker/dealers were entitled to a 3% broker fee on gross proceeds received by the Advanced Entertainment II for participation interests the broker solicited. Upon information and belief, Tripoint received a larger commission or other benefits for steering Plaintiffs to invest in the Side Pocket investments than represented to Plaintiffs.

166. The Profit Participation Purchase Agreement also included "Participation Schedules" that Plaintiffs would need to execute to invest in either of the first two "Events" being offered under the Profit Participation Purchase Agreement—Hamilton and Adele. The

Participation Schedules stated that within nine months from the investment the investor would receive a 10% "preference percentage," or return on investment, and a "remainder percentage" of 50%, meaning 50% of any additional profits from the ticket resales.

### E. <u>Plaintiffs' Investments in Advance Entertainment II (the Side Pocket Investments) in Reliance on the Fraudulent Misrepresentations and Omissions</u>

167. Plaintiffs agreed to invest in the Hamilton and Adele Side Pocket offerings in reliance on the aforementioned advice, recommendations, and misrepresentations of Tripoint, Elenowitz, Nathan, and Boswell related to the initial investment in 875 Holdings, their superior and unique investment expertise and experience, as touted in aforementioned meetings and on Tripoint's webpage, and the aforementioned false material misrepresentations made by Nathan regarding the Side Pocket investments.

168. To that end, Plaintiffs each executed a Profit Participation Purchase Agreement with Advance Entertainment II and Participation Schedules for the Hamilton and Adele events.

169. Between February 26, 2016 and March 3, 2016, Plaintiffs invested a total of $750,000 in the Hamilton Side Pocket investment and $450,000 in the Adele Side Pocket Investment, for total of $1,200,000 in Side Pocket investments, as follows:

a. Behar/I.B. Trading - $200,000 Hamilton Side Pocket investment and $200,000 Adele Side Pocket investment;

b. Sasson/Fusion Capital LLC - $50,000 Hamilton Side Pocket investment and $50,000 Adele Side Pocket investment;

c. Robert Koltun - $100,000 Hamilton Side Pocket investment and $100,000 Adele Side Pocket investment;

d. Arthur Luxenberg - $100,000 Hamilton Side Pocket investment; and

e. Macey/Thomas and Elizabeth Macey as Tenancy by the Entirety - $300,000 Hamilton Side Pocket investment and $200,000 Adelle Side Pocket investment.

170. On March 1, 2016, when the other Plaintiffs had already invested in the Side Pocket investments, but Macey had not yet invested, Nathan assured Macey in an email, "**We** are fully committed on Both side pocket opportunities and are circling on the remaining funds." (emphasis added).

171. On March 2, 2016, still having not compelled Macey to invest in the Side Pocket investments, Nathan emailed Macey stating, "We have reserved $500K for you in both Hamilton and Adele. Hamilton is now over subscribed and we need to confirm that you are moving forward or if not please let us know so we can release the block to other interested parties."

172. Those statements were false because no ticket blocks/assets were reserved for Macey or going to be released to other parties if Macey did not invest because no such ticket-related assets existed.

173. Nathan made the aforementioned false statements with complete and utter recklessness and disregard for their truth because Nathan and Tripoint failed to review or check the validity of the information regarding the investments that he presented to Behar and Levy. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire business was a fictitious sham.

174. Nathan made the aforementioned false representation to Macey without checking their truth solely to induce Macey to invest in the Side Pocket investments as quickly as possible.

175. Thereafter, on March 3, 2016, in reliance on Defendants' representations, Macey

purchased his aforementioned $500,000 interests in the Side Pocket investments.

## IV. Post-Investment Misrepresentations

176. In June and July 2016, Macey emailed Nathan inquiries about the investments. In response, Nathan assured Macey that the ticket business was in great shape, that Plaintiffs' investments were sound, and that Tripoint continues to recommend the ticket business investment to clients and investors.

177. Those statements were either knowingly false or made with utter and reckless disregard for the truth. If Nathan or Tripoint would have reviewed or checked that information, it would have learned that the ticket business was not in great shape; rather, it would have discovered obvious red flags and evidence that the ticket investment was a fraud. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire ticket business was a fictitious sham.

178. Thereafter, on August 1, 2016, Nathan attempted to extract more money from Plaintiffs by sending Behar a solicitation email seeking investments in a third Side Pocket opportunity ("Event III") related to the Coachella concert event. Nathan presented Behar with the investment and advised that they would have to hurry because "[t]he transaction is going to close soon."

179. Upon information and belief, those representations were knowingly false or with reckless disregard for their truth and made solely to induce Plaintiffs to invest in the third event as quickly as possible. Indeed, no agreement or pending transaction to purchase Coachella tickets existed.

180. Having not received investments for Coachella event, Nathan sent Plaintiff Behar

an email on August 17, 2016, again attempting to induce his investment. Nathan provided, "One of the investors in Event III needed to reduce his investment from $600K to $300K last minute. So there is temporarily a small opportunity to invest if your liquidity has changed. Please let me know ASAP."

181. These were knowing misrepresentations made to induce Behar to invest because there was no investor that reduced his investment last minute. Indeed, there were no Coachella tickets being purchased.

182. Although Plaintiffs ultimately did not invest in the Coachella event, Nathan's misrepresentations with regard to that event aimed at inducing Plaintiffs' investments in the continuing and ongoing fraudulent ticket investment scheme is further evidence of Defendants' fraudulent conduct and intent to defraud Plaintiffs for the purpose of securing their investments.

183. In December 29, 2016, Nathan emailed Macey and Behar in response inquiries regarding their investments by stating that they would receive distributions related to the Side Pocket investments "within the next 7-10 business days." Regarding Hamilton, Nathan stated "we have received 91% of our investment to date" and "the next distribution will include profits from this investment." Regarding Adele, Nathan stated, "we should expect to receive 1/3 of our investment back shortly" and "1/3 around the mid-end of January and the final distribution mid to late February."

184. Upon Macey's further inquiry regarding "why did they miss their target of having both investments and profits paid back in 2016?" and "how much longer on each do they expect it to take?", Harriton responded directly, with a copy to Nathan as follows:

> Event I we have already distributed 91% of invested capital and continue to

> distribute as money is collected, some of the inventory was pushed back to performances in 2017 for a variety of reasons but we expect to fully liquidate during first half of 2017 with economics along the lines we have been seeing.
>
> We sold Event II as a block to a financial institution, the payment terms were for three payments with the total received by January 31st 2017.

185. Those statements regarding payment and investment returns were false. If Nathan or Tripoint would have reviewed or checked that information, it would have learned Plaintiffs investment returns were not coming shortly and were not late because the ticket "inventory" was "pushed back" to shows on later dated; rather, it would have learned that those statements were false and discovered obvious red flags and evidence that the ticket investment was a fraud, including that no such ticket inventory existed.

186. Nathan knew those statements were false or made them with reckless disregard for the truth solely to prevent Plaintiffs' further inquiries into the fraudulent scheme. If Nathan or Tripoint would have checked or investigated that information they would have discovered its falsity. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire ticket business was a fictitious sham.

187. Nathan's representations were made to prevent and delay Plaintiff's inquiries into their investments and the fraudulent scheme and to perpetuate and keep the fraud going

188. On January 26, 2017, the United States of America filed a criminal complaint against Meli for securities fraud and wire fraud related to aforementioned ticket investment scheme. United States v. Simmons and Meli, 17 MAG 647 (S.D.N.Y. 2017). The criminal complaint was supported by the sworn statement of a Special Agent of the Federal Bureau of

Investigation ("FBI") that included Meli's recorded conversations explaining the ticket-related Ponzi Scheme.

189. On January 27, 2017, the SEC filed a lawsuit against, among others, Meli, Harriton, 875 Holdings, and Advance Entertainment II, for securities fraud related to aforementioned ticket-related investment scheme. SEC v. Meli, Harriton, et al., 1:17-cv-00632 (S.D.N.Y. 2017).

190. At all aforementioned times, Nathan, Boswell, and Elenowitz were agents of Tripoint. As such, Tripoint is liable for the conduct of Nathan, Boswell, and Elenowitz in promoting the Ponzi Scheme.

191. At all aforementioned times, Boswell and Elenowitz were the top two executives at Tripoint had full authority and control over the conduct of Nathan and the operations of Tripoint. As such, in addition to being personally liable for their own wrongful conduct, Boswell and Elenowitz have control person liability for the conduct of Nathan and Tripoint.

## FIRST CAUSE OF ACTION
**(Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5)**

192. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

193. Defendants, directly or indirectly, by the use of means or instrumentality of interstate commerce or of the mails, used or employed, in connection with the purchase or sale of securities, manipulative or deceptive devices or contrivances in contravention of the rules and regulations prescribed by the SEC, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

194. Defendants, directly or indirectly, in connection with the purchase or sale of

securities, used or employed a device, scheme, or artifice to defraud.

195. Defendants, directly or indirectly, in connection with the purchase or sale of securities, made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading.

196. Defendants, directly or indirectly, in connection with the purchase or sale of securities, engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with the purchase or sale of securities.

197. In particular with regard to Nathan, as previously described, Nathan, on behalf of himself and as an agent of Tripoint, made material misrepresentations, material misstatements, and omitted material facts related to the sale of securities in order induce Plaintiffs to invest in a fraudulent ticket investment scheme, and to keep the fraudulent scheme going, which included the following false material representations:

a. Tripoint had fully investigated, vetted, and conducted complete due diligence on the ticket investments;

b. Tripoint had analyzed the Ponzi Dealers' financial statements and business records to ensure that all corporate governance was handled appropriately including ensuring that the operators were handling financial and related issues in a customary and prudent manner;

c. The ticket investments were conservative, safe, and low-risk because they were backed by the tickets themselves and insurance was in place that would reimburse the price of tickets if an event was cancelled;

d. Tripoint principals, Nathan, Meli, and Harriton, had all invested their own personal money into the ticket investments;

e. 875 Holdings and Advance Entertainment II entered into ticket supply agreements that Plaintiffs could not review because the agreements were

highly confidential, but Tripoint reviewed the agreements and were satisfied;

f. 875 Holdings, Advance Entertainment II, Meli, Harriton, Nathan, and Tripoint had unique experience, contacts, and special access to the operators of the most desirable live events that allowed them to acquire contracts and “inside” and pre-sale purchases of tickets;

g. 875 Holdings and Advance Entertainment II purchased tickets for investment purposes and held ticket-related assets for resale on the secondary market;

h. Advance Entertainment II had a contract with the producer of Hamilton to buy 20% of the house seats for every performance so that the producers could use the money to get the Hamilton London and Hamilton road productions started;

i. Advance Entertainment II had a ticket purchase agreement with the producer of Adele’s North American tour, who was funding future concerts;

j. The reason that the Side Pocket investments were being offered through Advance Entertainment II rather than 875 Holdings or Advance Entertainment, included that “875 already has significant positions in both” and it would “eliminate any confusion and to make tracking and performance results easier;

k. The Hamilton Side pocket investment was “over subscribed” and being pursued by “other interested parties”;

l. Returns on the Hamilton Side Pocket investment were delayed because “some of the inventory was pushed back to performances in 2017”;

m. The Adele Side Pocket investment block of tickets was sold to a financial institution;

n. 875 Holdings, Advance Entertainment II, Meli, Harriton, Nathan, and Tripoint were soliciting investments, purchasing tickets, and operating for a legitimate, lawful investment business; and

o. That Nathan showed Levy valid ticket purchase agreements with event producers for the purchase of tickets in relation to the ticket resale enterprises.

198. As previously described, Nathan’s material representations and omission were false because:

a. 875 Holdings, Advance Entertainment II, Meli, or Harriton did not enter into agreements with the producers of shows, or anyone else, for the purchase of tickets for resale on the secondary market; as such, Nathan and Tripoint could not have reviewed such agreement and performed due diligence on such agreements as represented;

b. There was no insurance was in place that would reimburse investors the price of tickets if an event was cancelled; as such, Nathan and Tripoint could not have reviewed such insurance policies and performed due diligence on such agreements as represented;

c. 875 Holdings and Advance Entertainment II did not purchase tickets for investment purposes and did not hold ticket-related assets for resale on the secondary market for the benefit of investors;

d. The Side Pocket investments were offered through a new company—Advanced Entertainment II—to perpetuate and advance the fraudulent scheme, not for legitimate business purposes as represented;

e. Returns on the investments were not delayed due to legitimate business reasons; they were delayed because the investments were fraudulent;

f. Tripoint did not investigate, vet, and conduct due diligence with regard to the ticket investments and the companies offering them because if such investigation was performed, Tripoint would have discovered obvious red flags and evidence that the ticket investment was a fraud, including that there were no agreements in place for the purchase of tickets and no insurance in place related to the purchased tickets. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's representations were knowingly and intentionally false as the entire ticket business was a fictitious sham.

199. In addition, although Nathan was advised and knew that Plaintiffs were only interested in safe, low-risk investments, as previously described, Nathan represented that the ticket securities were suitable for Plaintiffs' stated needs and recommended that Plaintiffs purchase the ticket securities despite the fact that Nathan knew that such securities were not suited for Plaintiffs' stated needs.

200. As previously discussed, Nathan, on behalf of himself and Tripoint, made the

aforementioned material misrepresentations during in-person meetings, telephone meetings, and email communications between December 2015 and January 2017, including to Behar and Levy at an in-person meeting Behar's office in New York, New York on December 10, 2015 (initial meeting); to Behar at a subsequent in-person, also attended by Elenowitz, at Tripoint's offices in New York, New York in mid-December 2015; in emails to Nathan, Behar, and Levy on December 21, 2015; during various telephone meetings with Plaintiffs in December 2015; in emails to Levy and Macy on December 28, 2015, and December 29, 2015; in an email and solicitation letter Nathan sent to Plaintiffs regarding the Side Pocket investments on January 27, 2016; in an email to Levy on January 28, 2016; during a teleconferences with Plaintiffs concerning the Side Pocket investments in early February 2016; in emails to Macey on February 4, 2016 and February 23, 2016; an in-person meeting with Levy in Miami on February 22, 2016; in an email to Plaintiffs on February 24, 2016; in emails to Macey on March 1, 2016 and March 2, 2016; in emails to Macey in June and July 2016; in an emails to Behar on August 1, 2016, and August 17, 2016; and in emails to Macey and Behar on December 29, 2016.

201. As previously discussed, Nathan was told and understood Behar, Levy, and Macey were representation and acting on behalf of the group of investors made up of Plaintiffs in all meeting, teleconferences, and email communications regarding the ticket investments, and any information, representations, or materials provided by Nathan and Tripoint would be forwarded and shared with all Plaintiffs. Nathan intended that the information, representations, and materials conveyed would be provided to all Plaintiffs, and Behar, Levy, and Macey indeed conveyed the information, representations, and materials provided by Nathan to Plaintiffs as Nathan intended.

202. In particular with regard to Elenowitz, as previously described, Elenowitz, on behalf of himself and as an agent and controller of Tripoint, made material misrepresentations, material misstatements, and omitted material facts related to the sale of securities in order induce Plaintiffs to invest in the fraudulent ticket investment scheme, which included the following false material representations:

a. Elenowitz and Tripoint had investigated, vetted, and performed due diligence the ticket investment and the company/individuals offering the investments;

b. The investment was a no-brainer because the companies in which Plaintiffs would be investing had entered contracts with the shows for the purchase of tickets; and

c. That the investments were very safe because they were backed by the physical tickets to the events being purchased with the investment funds and insurance was in place in case an event for which tickets were purchased as cancelled.

203. As previously described, Elenowitz's material representations and omission were false because:

a. No agreements with the producers of shows, or anyone else, for the purchase of tickets for resale on the secondary market existed; as such, Elenowitz and Tripoint could not have reviewed such agreement and performed due diligence on such agreements as represented;

b. There was no insurance was in place that would reimburse investors the price of tickets if an event was cancelled; as such, Elenowitz and Tripoint could not have reviewed such insurance policies and performed due diligence on such agreements as represented;

c. Tripoint did not investigated, vetted, and conducted due diligence with regard to the ticket investments and the companies offering them, as represented by Elenowitz, because if such investigation was performed, Tripoint would have discovered obvious red flags and evidence that the ticket investment was a fraud, including that there were no agreements in place for the purchase of tickets and no insurance in place related to the purchased tickets. Alternatively, if any review, evaluation, or due diligence had been performed, then Elenowitz's representations were knowingly and intentionally false as the

entire ticket business was a fictitious sham.

204. In addition, although Elenowitz was advised knew that Plaintiffs were only interested in safe, low-risk investments, as previously described, Elenowitz represented that the ticket securities were suitable for Plaintiffs' stated needs and recommended that Plaintiffs purchase the ticket securities despite the fact that Elenowitz knew that such securities were not suited for Plaintiffs' stated needs.

205. Elenowitz, on behalf of himself and Tripoint, made those material misrepresentations during an in-person meeting with Behar at Tripoint's offices in New York, New York in the middle of December 2015.

206. As previously discussed, Elenowitz was told and understood Behar was attending the meeting and acting on behalf of the group of investors made of Plaintiffs, and any information, representations, or materials provided by Elenowitz and Tripoint would be forwarded and shared with all Plaintiffs.

207. Elenowitz intended that his representations provided to Behar regarding the ticket investments would be provided and conveyed to Plaintiffs in connection with soliciting their investments, and Behar indeed conveyed the information, representations, and materials provided by Elenowitz to Plaintiffs as Elenowitz intended.

208. In particular with regard to Boswell, as previously described, Boswell, on behalf of himself and as an agent and controller of Tripoint, made material misrepresentations, material misstatements, and omitted material facts related to the sale of securities in order induce Plaintiffs to invest in a fraudulent ticket investment scheme.

209. Boswell's material misrepresentations and omissions included that Boswell

personally performed an anti-fraud compliance review of the investment documentation related to the ticket investments and the investment documentation and details passed his compliance review.

210. As previously described, Boswell's material representations and omissions regarding his compliance review were false because, had he investigated, vetted, and conducted a compliance review or due diligence with regard to the ticket investments and the companies offering them, he would have discovered obvious red flags and evidence that the ticket investment was a fraud. Alternatively, if any review, evaluation, or due diligence had been performed, then Boswell's representations were knowingly and intentionally false as the entire ticket business was a fictitious sham.

211. Boswell, on behalf of himself and Tripoint, made those material misrepresentations in emails to Nathan on December 29, 2015 and December 29, 2015, and knew, understood, and intended that Nathan would be forwarding those representations to Plaintiffs in connection with their decision to invest in the ticket investments.

212. In addition, upon information and belief, Defendants' material misrepresentations and omissions included their failure to disclose the true payment and benefits they were receiving in exchanging for advising, recommending, and steering Plaintiffs to invest in the fraudulent ticket scheme.

213. The previously described misrepresentations and omissions made by Nathan, Elenowitz, and Boswell were material because a reasonable investor would consider such information and omissions important in determining whether to invest in the ticket investments, and Plaintiffs in fact relied up on such misrepresentations and omissions in determining to invest

in the ticket investments.

214. As previously discussed, Nathan, Elenowitz, and Boswell knowingly made the aforementioned materially false statements and omissions with the intent to defraud Plaintiffs.

215. When Nathan, Elenowitz, and Boswell made the above-described materially false misrepresentation and omissions, they either knew their falsity or had a complete and utter reckless and disregard for their truth because a review or investigation into the statements would have revealed their falsity, and an investigation into the ticket investments and companies offering them would have raised red flags and revealed their fraudulence.

216. Nathan, Elenowitz, and Boswell either consciously determined not to investigate whether the information regarding the investments they provided to Plaintiffs were true, although their truth was ascertainable, but nevertheless represented to Plaintiffs that they knew the facts to be true. Alternatively, if any review, evaluation, or due diligence had been performed, then Nathan's, Elenowitz's, and Boswell's representations were knowingly and intentionally false as the entire ticket business was a fictitious sham.

217. Defendants had the motive and opportunity to make misleading statements to defraud Plaintiffs because Defendants and Tripoint's compensation related to the subject investments were contingent on the amount of investments they could secure for the Ponzi Scheme and their ability to keep the Ponzi Scheme going. Defendants received compensation for steering and inducing Plaintiffs to invest it the fraudulent ticket investments that they would not have received but for Defendants' investments. Elenowitz and Boswell also directly and personally benefited from the success of Tripoint related to the investments as its founders and owners.

218. To further induce Plaintiffs to enter the investment, and to lend reliability and credibility to their representations regarding the ticket investments and their advice and recommendations to invest in the Ponzi Scheme, Defendants urged Plaintiffs to review the credentials of their firm, Tripoint, on the Tripoint website and its full-service financial staff that included finance experts, an in-house corporate attorney, and a compliance department.

219. Plaintiffs justifiably relied on Nathan's, Elenowitz's, and Boswell's aforementioned misrepresentations, omissions of material fact, advice and recommendations, made on behalf of themselves and Tripoint, in determining to invest in the ticket investments, and Plaintiffs would not have invested in the ticket investments had they known the truth.

220. By reason of the foregoing, Defendants committed unlawful fraudulent conduct in connection with the purchase or sale of securities in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5).

221. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

222. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused by their violations of Section 10(b) of the Exchange Act and Rule 10b-5 in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

## SECOND CAUSE OF ACTION
## (Sections 9(a)(4) and 9(f) of the Exchange Act)

223. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

224. Defendants, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, for the purpose of inducing the purchase or sale of

securities, made statements of material facts that were false or misleading in the light of the circumstances under which they were made, and which and that Defendants knew or had reasonable grounds to believe were false or misleading with respect to material facts.

225. Defendants willfully participated with the Ponzi Dealers in a fraudulent scheme to, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, for the purpose of inducing the purchase or sale of securities, commit deceptive acts, transactions, and practices related to the sale of securities.

226. Defendants willfully participated with the Ponzi Dealers in a fraudulent scheme to, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, for the purpose of inducing the purchase or sale of securities, made statements of material facts that were false or misleading in the light of the circumstances under which they were made, and which and that Defendants knew or had reasonable grounds to believe were false or misleading with respect to material facts.

227. By reason of the foregoing, including the allegations previously set out detailing each Defendants' conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5, Defendants violated Sections 9(a)(4) and 9(f) of the Exchange Act (15 U.S.C. §§ 78i(a)(4) and 78i(f)).

228. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

229. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused their violations of Sections 9(a)(4) and 9(f) of the Exchange Act in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**THIRD CAUSE OF ACTION**
**(Sections 20(a) of the Exchange Act against Defendants Boswell and Elenowitz)**

230. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

231. At all times mentioned, Boswell and Elenowitz controlled Nathan and Tripoint by virtue of their key, high-level positions at Tripoint.

232. In particular, Elenowitz was at the relevant time and is Tripoint's Chief Executive Officer.

233. Boswell was at the relevant time and is Tripoint's President, Chief Operating Officer, and Chief Compliance Officer.

234. In addition, Elenowitz and Boswell are the co-founders of Tripoint and solely make up Tripoint's "Executive Team."

235. By reason of their positions at Tripoint, Boswell and Elenowitz had authority over Tripoint's operations, participated in the day-to-day management of Tripoint, and were the ultimate decision makers for Tripoint.

236. By reason of their positions at Tripoint, Boswell and Elenowitz had full authority over Nathan, his functions on behalf of Tripoint, and his day-to-day employment and business activities.

237. Boswell and Elenowitz's power and authority over Nathan and Tripoint included their conduct at issue in this lawsuit aimed at soliciting and inducing Plaintiffs to invest in the fraudulent ticket investments.

238. Upon information and belief, Nathan and Tripoint were required obtain approval and review from Elenowitz and Boswell before the subject investments could be placed.

239. As previously discussed, Elenowitz directly met with a representative of Plaintiffs' investor group, Boswell performed a compliance review of the investment documentation, and Nathan copied Elenowitz and Boswell on emails to Plaintiffs regarding the investments.

240. As such, Boswell and Elenowitz were and are each a "controlling person" for the acts of Tripoint and Nathan—the controlled persons— pursuant to Section 20(a) of the Securities and Exchange Act.

241. As previously discussed in detailed, including the allegations previously set out detailing each Defendants' conduct in violation of Section 10(b) of the Exchange Act, Rule 10b-5, and Sections 9(a)(4) and 9(f) of the Exchange Act, Tripoint and Nathan are primary violators of the Exchange Act based on their fraudulent conduct in connection with the sale of the subject ticket-related securities.

242. As previously discussed in detailed, including the allegations previously set out detailing each Defendants' conduct in violation of Section 10(b) of the Exchange Act, Rule 10b-5, and Sections 9(a)(4) and 9(f) of the Exchange Act, Elenowitz and Boswell were culpable participants in Tripoint and Nathan's fraudulent conduct in connection with the sale of the subject ticket-related securities.

243. In particular, as previously discussed, Elenowitz and Boswell made misrepresentations and material omissions in furtherance of the fraud related to the nature of the subject ticket investments, the safety of the subject ticket investments, and the due diligence that had been performed in connection with the Ponzi Scheme.

244. Moreover, Elenowitz and Boswell acted recklessly in failing to review or check the truth of the information that they, Nathan, and Tripoint were providing to Plaintiffs regarding the

ticket investments.

245. Elenowitz and Boswell's conduct, both in affirmatively acting in furtherance of the fraud, and in failing to maintain a reasonable and proper system of supervision, internal control, and compliance over their controlled persons' (Nathan and Tripoint) compliance with securities laws, induced the aforementioned violations of the Exchange Act.

246. By reason of the foregoing, Boswell and Elenowitz violated Section 20(a) of the Exchange Act (15 U.SC. § 78t).

247. By reason of the foregoing, Boswell and Elenowitz are individually jointly and severally liable to the same extent as Tripoint and Nathan for violations of the Exchange Act.

248. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

249. By reason therefor, Plaintiffs seeks a judgment against Defendants Boswell and Elenowitz, jointly and severally, in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**FOURTH CAUSE OF ACTION**
**(Breach of Fiduciary Duties)**

250. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

251. A fiduciary relationship existed between Plaintiffs and Defendants arising out of Defendants' aforementioned conduct, acts, and representations.

252. In particular, a fiduciary duty existed between Plaintiffs and Defendants based on Nathan and Baher's nearly ten-year relationship prior to the investments; Nathan's representations

that he had a long-time personal relationship with and trusted Harriton; Defendants' representations, statements, and materials touting Tripoint's unique, special, and superior expertise and knowledge regarding finance, investments, securities, compliance, and the ticketing/live-event industry; Defendants representations leading Plaintiffs to believe that the ticket investments were being offered pursuant to a joint-venture between Tripoint and the ticket investment companies; Defendants' representations that it vetted and investigated the ticket investments and the companies offering them; Defendants' representations that Tripoint would provide advisory services regarding the suitability of investments; Defendants' representations that, based on their investigation and expertise, the investments were safe and suitable for Plaintiffs; Defendants' affirmative recommendations and advice that Plaintiffs should purchase the ticket securities; Defendants' representations that they themselves invested in the ticket securities; Defendants' participation in the Executive Summary offering document for 875 Holdings, evidenced by Tripoint's name on each page of that document; and Defendants' participation in drafting the Subscription Agreement for the Side Pocket investment.

253. Pursuant to Defendants' aforementioned conduct, Defendants made clear that they were not merely a placement agent, but were acted as Plaintiffs' investment advisor with unique experience and knowledge that Plaintiffs could trust for investment guidance and advice. Indeed, to lend credibility to their advice and recommendations to invest in the Ponzi Scheme, Defendants' urged Plaintiffs to review the credentials of their firm, Tripoint, on the Tripoint website and its full-service financial staff that provided various investment advisory services and included finance experts, an in-house corporate attorney, and a compliance department.

254. Pursuant to Defendants' aforementioned conduct, a special relationship of trust and

confidence existed between the parties that created a fiduciary relationship and caused Plaintiffs to justifiably rely on Defendants' representations, advice, and recommendations as their trusted, expert investment advisor.

255. Defendants' conduct and representations reposed confidence in Defendants and Plaintiffs reasonably relied on Defendants investment advice based on Defendants' purported superior knowledge and expertise.

256. Defendants were aware and knew that Plaintiffs would rely on Defendants' representations, advice, and recommendations related to the ticket investments, and provided advice with regard to the ticket investment opportunities with the intent that Plaintiffs rely on such advice.

257. Defendants breached their fiduciary duties to Plaintiffs, including the duty to communicate honestly; the duty to conduct reasonable due diligence and investigation into the securities and security dealers being recommended; the duty to only recommend a security upon an adequate and reasonable basis; the duty to impart correcting information to Defendants and take reasonable steps to verify the truth of representations made to Plaintiffs; the duty to disclose facts related to the investments that Defendants knew or could have ascertained; and, if essential information about a security was not available, the duty to disclose the unavailability of such information and identify the risks associated with the absence of such information.

258. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

259. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused their breaches in an amount to be proven at trial, but not less

than $1,750,000, plus interest and costs.

**FIFTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**

260. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

261. Pursuant to the above-described special relationship between Plaintiffs and Defendants, Defendants had a duty to speak with care and impart correct information to Plaintiffs regarding the ticket investments.

262. Defendants provided Plaintiffs with incorrect and untruthful information relating to the ticket investments.

263. Defendants were aware and knew that Plaintiffs would rely on Defendants' representations, advise, and recommendations related to the ticket investments.

264. Plaintiffs reasonably and justifiably relied on the incorrect and untruthful information and advise that Defendants provided relating to the ticket investments.

265. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

266. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused their breaches in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**SIXTH CAUSE OF ACTION**
**(Negligence)**

267. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

268. Pursuant to the above-described relationship between Plaintiffs and Defendants,

Defendants owed Plaintiffs a duty to exercise reasonable care when providing investment advice and recommendations that include a duty perform reasonable investigations into the investments they were recommending.

269. Defendants' breached their duties of care to Plaintiffs.

270. As a direct and proximate result of Defendants breaches of their duties, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

271. By reason therefor, Plaintiffs seeks a judgment against Defendants, jointly and severally, for all damages caused their breaches in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**SEVENTH CAUSE OF ACTION**
**(Fraud/Fraudulent Misrepresentation/Fraudulent Inducement)**

272. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

273. As previously discussed in detailed, including the allegations previously set out detailing each Defendants' conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5, Defendants made knowingly false statements of material fact to Defendants, and knowingly concealed and omitted material facts from Defendants, related to the ticket investments.

274. Pursuant to the previously described conduct, Defendants' knowing false statements and omissions of material facts were made with the intent and purpose of inducing Plaintiffs to invest in the fraudulent ticket scheme.

275. Plaintiffs justifiably relied on Defendants' knowing misrepresentations and omissions of material facts in determining to invest in the ticket investments, and Plaintiffs would

not have invested in the ticket investments had they known the truth.

276. As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

277. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused their fraud in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs, plus punitive damages due to Defendants' fraudulent and criminal conduct.

**EIGHTH CAUSE OF ACTION**
**(New York General Business Law § 349)**

278. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

279. Defendants committed deceptive acts and practices related to their business and in relation to furnishing services and advice in the State of New York.

280. Defendants' deceptive acts, practices, and misleading statements were aimed at inducing Plaintiffs to invest in the fraudulent ticket investments.

281. Defendants' deceptive acts, practices, and misconduct were consumer-orientated and misleading in material respects. Defendants conduct was aimed at Plaintiffs--consumers and members of the general investing public.

282. Defendants also used deceptive acts, practices, and misleading statements to promote the fraudulent investments to other consumers and investors (see Ex. B).

283. The fraudulent investments vehicles that Defendants' promoted defrauded millions of dollars from consumers and the public. See United States v. Simmons and Meli, 17 MAG 647 (S.D.N.Y. 2017); SEC v. Meli, Harriton, et al., 1:17-cv-00632 (S.D.N.Y. 2017).

284. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

285. As a direct and proximate result of Defendants' deceptive acts and practices, the public and consumers have suffered substantial monetary damages.

286. By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused their breaches in an amount to be proven at trial, but not less than $1,750,000, plus interest and costs.

**NINTH CAUSE OF ACTION**
**(Unjust Enrichment and Establishment of Constructive Trust)**

287. Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein in full.

288. Defendants benefited at the expense o288-289)f Plaintiffs by receiving commissions, payments, and other benefits from the Ponzi Dealers for steering Plaintiffs to invest in the ticket scheme.

289. Defendants also benefited at the expense of Plaintiffs to the extent Defendants' invested in the ticket schemes and received priority returns on their investments.

290. Equity and good conscience require restitution/compensation for the benefit that Defendants received at Plaintiffs' expense.

291. By reason therefor, Plaintiffs seek judgment against Defendants, jointly and severally, for all damages caused by Defendants' unjust enrichment, plus interest and costs.

292. Plaintiffs are also are entitled to, and seek, the establishment of a constructive trust impressed on the benefits to Defendants and inequitable conduct.

**WHEREFORE**, Plaintiffs demand judgment as follows:

1. Awarding damages in an amount to be proven at trial, but not less than $1,750,000, plus interest;

2. Declaring that Defendants have been unjustly enriched and an awarding of damages in an amount of Defendants' unjust enrichment to be proven at trial, plus interest, and imposing a constructive trust to recoup Defendants' fees, unjust benefits and other assets for the benefit of Plaintiffs;

3. Awarding punitive damages arising from Defendants' fraudulent and criminal conduct;

4. Awarding Plaintiffs their costs and expenses related to this action, including reasonable attorney fees and other legal fees and costs; and

such other and further relief as the court finds just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by a Jury on all issues triable by right of Jury.

**DUKE, HOLZMAN, PHOTIADIS & GRESENS LLP**

By: *s/ Steven W. Klutkowski*

Steven W. Klutkowski, Esq.
*Attorneys for Plaintiff*s
701 Seneca Street, Suite 750
Buffalo, New York 14210
Tel.: (716) 855-1111

DATED: July 14, 2017