UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------
I.B. TRADING, INC., IAN BEHAR, JORON
MANAGEMENT, LLC, JORDAN LEVY, THOMAS
MACEY AND ELIZABETH MACEY,
Individually and as Tenancy by the
Entirety, FUSION CAPITAL LLC, RYAN
SASSON, ROBERT KOLTUN, and ARTHUR
LUXENBERG,

                Plaintiffs,

        - v.-

TRIPOINT GLOBAL EQUITIES, LLC, ROBERT
NATHAN, MARK H. ELENOWITZ, and
MICHAEL BOSWELL,

                Defendants.
------------------------------------

17-cv-1962 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

    This case is about an alleged Ponzi scheme marketed as an
investment to buy and resell tickets to popular Broadway shows
and national pop music tours. The plaintiffs are a group of
individual investors and their affiliated entities: I.B.
Trading, Inc., Ian Behar, JoRon Management, LLC, Jordan Levy,
Thomas and Elizabeth Macey, Fusion Capital LLC, Ryan Sasson,
Robert Koltun, and Arthur Luxenberg. The plaintiffs commenced
this action by filing a Complaint on March 17, 2017, which they
amended on July 14, 2017, against the defendants, TriPoint
Global Equities, LLC, Robert Nathan, Mark H. Elenowitz, and
Michael Boswell. TriPoint is a broker-dealer registered with the
United States Securities and Exchange Commission ("SEC"). Nathan

is the Director of TriPoint's Specialty Finance Group. Elenowitz and Boswell are the co-founders of TriPoint. Elenowitz is the Chief Executive Officer ("CEO") of TriPoint, and Boswell is the Chief Operating Officer ("COO") and Chief Compliance Officer ("CCO") of TriPoint. Elenowitz and Boswell are each a Managing Director of TriPoint and together make up TriPoint's "Executive Team."

The plaintiffs allege causes of action for violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), (the "Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (First Cause of Action); Sections 9(a)(4) and 9(f) of the Exchange Act, 15 U.S.C. §§ 78i(a)(4), 78i(f) (Second Cause of Action); and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)(Third Cause of Action). The plaintiffs also allege state law causes of action for breach of fiduciary duty (Fourth Cause of Action); negligent misrepresentation (Fifth Cause of Action); negligence (Sixth Cause of Action); fraud (Seventh Cause of Action); violation of New York General Business Law § 349 (Eighth Cause of Action); and unjust enrichment and the establishment of a constructive trust (Ninth Cause of Action). The defendants have moved to dismiss the Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). The defendants also move to strike Exhibit B to the Amended Complaint, and

references thereto, pursuant to Federal Rule of Civil Procedure 12(f).

I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the Amended Complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the Amended Complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of

3

the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the Amended Complaint "(1) specify the statements that the plaintiff[s] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the Amended Complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99; see also In re Eaton Corp. Sec. Litig., No. 16-cv-5894, 2017 WL 4217146, at *1 (S.D.N.Y. Sept. 20, 2017).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the Amended Complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). See also

Silsby v. Icahn, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), aff'd sub nom. Lucas v. Icahn, 616 F. App'x. 448 (2d Cir. 2015).

II.

The following facts alleged in the Amended Complaint are accepted as true for the purposes of the defendants' motion to dismiss.

In early December 2015, Nathan, the Director of the Specialty Finance Group at TriPoint, contacted Behar about an investment opportunity in which Nathan thought Behar and Behar's investment group would be interested. Am. Comp. ¶ 45. Nathan advised that the opportunity was a "no-brainer." Id. Nathan and Behar had known each other for approximately ten years, but this was the first time Nathan had reached out to Behar regarding an investment opportunity. Id. ¶¶ 44-45. On December 10, 2015, Behar and Levy, on behalf of themselves and their investment group, met with Nathan, and with Joseph Meli and Matthew Harriton, at Behar's office in Manhattan. Id. ¶ 49. Nathan, Meli, and Harriton explained the investment opportunity, in which 875 Holdings, LLC ("875 Holdings"), an entity majority-owned by Harriton, would partner with TriPoint to purchase blocks of tickets to popular events, such as Broadway musicals and pop concerts, and resell them on the secondary market for a profit. Id. ¶¶ 37, 38, 54. Nathan, Meli, and Harriton told Behar and Levy that the investments were extremely safe because the

5

investments were backed by actual tickets to the events, which in turn were insured such that the investors would be reimbursed the purchase price if an event was canceled. Id. ¶ 54. Nathan assured Behar and Levy that TriPoint had vetted and conducted due diligence on the investment and the companies offering it and highly recommended it. Id.

Additionally, Nathan provided Behar and Levy with an Executive Summary --- marked with "875 Holdings, LLC" and "TriPoint Global Equities, LLC," as well as TriPoint's logo --- which anticipated that investors would receive a return on their investments "in excess of 20% per annum," touted the "deep and very unique mix of live event promotion, ticketing, and entertainment finance experience" of 875 Holdings' management, and assured potential investors that there was "No Cancellation Risk" because 875 Holdings would require event promotors to reimburse 875 Holdings for canceled events and/or assure that "acceptable insurance arrangements are in place that will cover the purchased inventory and any expense involved to process ticket refunds." Id. ¶ 64. The Executive Summary also stated that TriPoint would receive a 5% commission based on the total amount of capital received by 875 Holdings. Id. ¶ 74. Nathan told Behar and Levy that he had gone to high school with Harriton, and that Nathan, Meli, Harriton, Elenowitz, and

Boswell had all personally invested substantial sums in the venture. Id. ¶ 77.

In mid-December, 2015, Behar, on behalf of himself and the other plaintiffs, attended a meeting regarding the ticket investment at TriPoint's offices with Nathan and Elenowitz.[1] Id. ¶ 81. Elenowitz told Behar that the ticket investment was a "no-brainer" because the investment was backed by physical tickets to the events, which were insured against the risk an event was canceled, and that TriPoint had verified this through its due diligence. Id. ¶ 85. After this meeting, Nathan reiterated that the ticket investment was low-risk, backed by real tickets and insurance, and that Nathan, Elenowitz, Boswell, Meli, and Harriton had all invested their own money. Id. ¶ 95. When Macey asked to review the ticket purchase agreements between 875 Holdings and the event producers, Nathan told Macey that neither TriPoint nor 875 Holdings could allow Macey to review the agreements because they were highly confidential. Id. However, Nathan assured the plaintiffs that TriPoint had reviewed the agreements and was satisfied. Id.

On December 28 and 29, 2015, at Boswell's direction, Nathan sent Levy and Macey e-mails touting TriPoint's compliance

---

[1] While the Amended Complaint states that this meeting happened in "mid-December 2016," Am. Compl. ¶ 81, this appears to be a clerical error.

department and TriPoint's compliance with Financial Industry
Regulatory Authority ("FINRA") "Anti Money Laundering and Fraud
Prevention" regulations. Id. ¶ 110. Nathan advised that Boswell
was personally performing a compliance review of the ticket
investment, and the e-mails showed that Boswell had completed
his compliance review and approved the ticket investment. Id.
¶¶ 111-12.

Based on the defendants' representations, between December
2015 and February 2016 the plaintiffs purchased Class B
Interests in 875 Holdings pursuant to the 875 Holdings
Subscription Agreement. Id. ¶¶ 119-20. Collectively, the
plaintiffs invested $550,000 as follows:

- I.B. Trading and Behar, its principal and manager,
  invested $100,000;

- JoRon Management and Levy, its principal and manager,
  invested $100,000;

- Fusion Capital and Sasson, its principal and manager,
  invested $100,000;

- Koltun invested $100,000; and

- Macey and his wife, Elizabeth Macey, as Tenancy by the
  Entirety, invested $150,000.

Id. ¶ 120.

On January 27, 2016, Nathan circulated a solicitation for
two follow-on "Side Pocket" investments, available only to
investors in 875 Holdings. Id. ¶ 128. The "Side Pocket"
investments were for tickets to the Broadway musical, Hamilton,

and Adele's North American tour. Id. ¶ 129. The solicitation explained that the "Side Pocket" investments would be conducted through a new entity, Advanced Entertainment II, because Meli and Harriton did not think it was prudent to increase 875 Holdings' existing stake in these events until more capital was raised. Id. ¶ 128. In a subsequent teleconference regarding the "Side Pocket" investments, Nathan explained to the plaintiffs that Advanced Entertainment II had a contract with the producer of Hamilton to purchase 20% of the house seats for every performance, and that the producer was planning to use the funds to finance the upcoming London production. Id. ¶¶ 136-37. Similarly, Nathan told the plaintiffs that Advanced Entertainment II had a ticket purchase agreement with the producer of Adele's North American tour. Id. ¶ 138. Nathan also advised that TriPoint was partnering with Meli, Harriton, and Advanced Entertainment II to draft the Subscription Agreement for the "Side Pocket" investments. Id. ¶ 144.

During a meeting on or around February 22, 2016 in Miami, Nathan showed Levy documents on Nathan's cell phone that Nathan claimed were the ticket purchase agreements between Advanced Entertainment II and the producers of Hamilton and Adele's North American tour. Id. ¶¶ 151, 153. Nathan, Boswell, and Elenowitz were then copied on a February 18, 2016 e-mail providing the plaintiffs with the documents necessary to participate in the

9

"Side Pocket" investments. Id. ¶ 146. The Profit Participation Purchase Agreement relating to the "Side Pocket" investments, a revised copy of which Nathan provided to the plaintiffs on February 24, 2016, provided that TriPoint was entitled to a 3% broker fee on the gross proceeds received by Advanced Entertainment II. Id. ¶ 165. The Profit Participation Purchase Agreement included a Participation Schedule, which stated that within nine months of the investment the investors would receive a 10% "preference percentage" return and 50% of any additional profits from the ticket sales for the first two events --- Hamilton and Adele's North American tour. Id. ¶ 166. Between February 26, 2016 and March 3, 2016, the plaintiffs collectively invested in the "Side Pocket", as follows:

- I.B. Trading and Behar invested $200,000 in the Hamilton "Side Pocket" and $200,000 in the Adele "Side Pocket";

- Fusion Capital and Sasson invested $50,000 in the Hamilton "Side Pocket" and $50,000 in the Adele "Side Pocket";

- Koltun invested $100,000 in the Hamilton "Side Pocket" and $100,000 in the Adele "Side Pocket";

- Macey and his wife, Elizabeth Macey, as Tenancy by the Entirety, invested $300,000 in the Hamilton "Side Pocket" and $200,000 in the Adele "Side Pocket"; and

- Luxenberg invested $100,000 in the Hamilton "Side Pocket."

Id. ¶ 169.[2]

In June 2016, in response to an inquiry from Macey, Nathan e-mailed Macey and assured him that the ticket investments were in "great shape," that the investments were sound, and that TriPoint continued to recommend the ticket investments to clients. Id. ¶ 176. Nathan also solicited further investments from the plaintiffs during the summer of 2016, but the plaintiffs did not invest. Id. ¶¶ 178-80.

On December 29, 2016, Nathan e-mailed Macey and Behar telling them that they would receive distributions related to the "Side Pocket" investments "within the next 7-10 business days." Id. ¶ 183. Nathan stated further that "we have received 91% of our investment to date" in Hamilton and "the next distribution will include profits from this investment." Id. Nathan also stated that "we should expect to receive 1/3 of our investment back shortly" with regard to the Adele tickets, and "1/3 around the mid-end of January and the final distribution mid to late February." Id. In response to the plaintiffs' questions about why the managers had missed their stated target of having all capital and profits returned in 2016, Harriton replied, with a copy to Nathan, that "inventory was pushed back to performances in 2017 for a variety of reasons but we expect

[2] The Amended Complaint incorrectly states that these amounts added up to $ 1,200,000.

to fully liquidate during first half of 2017 with economics along the lines we have been seeing. We sold Event II as a block to a financial institution, the payment terms were for three payments with the total received by January 31st 2017." Id. ¶ 184.

The plaintiffs allege that virtually every statement the defendants made with respect to the ticket investments was false. They claim that neither 875 Holdings nor Advanced Entertainment II ever purchased any tickets, that no ticket purchase agreements were ever executed, that no insurance was ever purchased in connection with any tickets, and that no returns were ever received based on the investments.

On January 26, 2017, the Government filed a criminal complaint against Meli for securities fraud and wire fraud related to the ticket investments. On January 27, 2017, the SEC filed a lawsuit against Meli, Harriton, 875 Holdings, and Advanced Entertainment II, among others, for securities fraud related to the ticket investments. Id. ¶¶ 188-89.

### III.

The defendants move to dismiss the plaintiffs' federal securities law claims asserted under Sections 10(b), 9(a)(4), 9(f), and 20(a) of the Exchange Act and the Rules promulgated thereunder.

**A.**

The defendants move to dismiss the plaintiffs' claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (the First Cause of Action). To sustain a private claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reasonable reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Ashland Inc. v. Morgan Stanley & Co., 652 F.3d 333, 337 (2d Cir. 2011) (citation and footnote omitted). The defendants argue that the plaintiffs have not pleaded any material misrepresentations or scienter by the defendants, or reasonable reliance by the plaintiffs, with the specificity required by Rule 9(b) and the PSLRA.

**i.**

The defendants argue that the Section 10(b) claim should be dismissed because the plaintiffs have failed to allege any material misstatements by the defendants. This argument has no merit. A misstatement is material if there is "a substantial likelihood" that the misstatement "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485

13

U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). "Because materiality is a mixed question of law and fact, in the context of a [Federal Rule of Civil Procedure] 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks and citation omitted). The Amended Complaint contains numerous, specific allegations of material misrepresentations by the defendants. The plaintiffs specify when, where, and by whom the statements were made, as well was why they were fraudulent, as required by Section 9(b).

According to the Amended Complaint, on December 10, 2015, at Behar's office in Manhattan, Nathan[3] represented that the original ticket investment was safe and low risk because it was backed by actual tickets to real events purchased under exclusive ticket purchase agreements that Meli, Harriton, and

---

[3] The plaintiffs correctly point out that TriPoint, as principal, may be liable for the misrepresentations or omissions of Nathan, its agent, acting within the scope of Nathan's employment. See In re Parmalat Sec. Litig., 474 F. Supp. 2d 547, 551-53 (S.D.N.Y. 2007).

14

875 Holdings had entered into with the producers of the events; that insurance had been procured that would reimburse investors for the price of the tickets if an event was canceled; and that TriPoint had vetted and completed full due diligence related to the ticket investment and the companies offering the investment. Am. Compl. ¶ 54. At the same meeting, Nathan provided Behar and Levy with the Executive Summary, which stated that "875 [Holdings] will enter into an agreement to purchase an allocation of tickets to an upcoming event or series of events, in most cases from an 'Event Sponsor' (typically a promoter, producer, venue, or team)." Id.

The plaintiffs further allege that subsequent to the second meeting in December, 2015, prior to the plaintiffs' investments, Nathan represented during teleconferences and over e-mail that TriPoint had analyzed the ticket resale companies' financial statements and business records to ensure that all corporate governance was handled appropriately; that the ticket investment was very conservative because it was backed by the tickets themselves and because insurance was in place to cover the price of purchased tickets if an event was canceled; that TriPoint and 875 Holdings could not share the underlying ticket purchase agreements with the plaintiffs because they were highly confidential; and that TriPoint had reviewed the underlying ticket purchase agreements and was satisfied. Id. ¶ 95. In a

15

January 28, 2016 e-mail, after the plaintiffs had invested in 875 Holdings, Nathan advised the plaintiffs that things were "going well." Id. ¶ 121.

Nathan also sent the plaintiffs a solicitation for the "Side Pocket" investments, which stated that the reason the "Side Pocket" investments were being offered through a new entity, Advanced Entertainment II, rather than through 875 Holdings, was that 875 Holdings already had significant positions in the Hamilton and Adele ticket investments and that the "Side Pocket" investments would be repaid, including profits, on or before November 30, 2016. Id. ¶¶ 128, 129.

The plaintiffs further allege that during a teleconference in early February, 2016, Nathan told the plaintiffs that Advanced Entertainment II had a contract with the producer of Hamilton to purchase 20% of the house seats for every performance, as well as a purchase agreement with the producer of Adele's North American tour. Id. ¶¶ 136-38. Several of these alleged misrepresentations were reiterated in a Profit Participation Purchase Agreement relating to the "Side Pocket" investments that Nathan provided to the plaintiffs on February 24, 2016. Id. ¶ 160.

During a meeting in Miami, Florida, on February 22, 2016, Nathan allegedly showed Levy written agreements on Nathan's cell phone that Nathan represented were ticket purchase agreements

between Advanced Entertainment II and the producers of Hamilton and Adele's North American tour. Id. ¶¶ 151-53. In response to inquiries by the plaintiffs regarding the "Side Pocket" investments, Nathan sent Macey and Behar an e-mail on December 29, 2016 stating that the plaintiffs would receive distributions relating to the investments "within the next 7-10 business days," and that "we have received 91% of our investment to date" regarding Hamilton, and that they should expect to receive one third of their investment relating to Adele's North American tour "shortly," another one third "around the mid-end of January," and the final third "mid to late February." Id. ¶ 183.

The plaintiffs also allege material misrepresentations by Elenowitz. At the second meeting regarding the plaintiffs' investment in 875 Holdings, at TriPoint's offices in Manhattan, Elenowitz represented to Behar that he and TriPoint had investigated and performed due diligence regarding the ticket investment and the company and individuals offering the investment. Id. ¶¶ 81, 83. Elenowitz told Behar that TriPoint had conducted due diligence confirming that the ticket investment was a "no-brainer" because the companies in which the plaintiffs would be investing had entered into contracts for the purchase of the tickets, the investments were backed by the physical tickets to the events, insurance was in place in case

an event was canceled, and TriPoint had conducted due diligence to verify these facts. Id. ¶ 85.

The plaintiffs also allege that Boswell made material misrepresentations. In e-mail communication to Levy and Macey on December 28 and 29, 2015, Nathan advised that Boswell, TriPoint's COO and CCO, was personally performing a compliance review on the investment documentation. Id. ¶ 111. The plaintiffs allege that Boswell directed Nathan to forward e-mails to Levy and Macey that showed that Boswell's compliance review was a required precondition to the investments being placed, that Boswell had personally performed a compliance review of the investment documentation, and that the investment passed Boswell's review. Id. ¶¶ 112-14. The plaintiffs also allege that Elenowitz and Boswell, along with Nathan, were copied on a February 18, 2016 e-mail to the plaintiffs providing the investment documents for the "Side Pocket" investments, thereby indicating their approval of the attached documents. Id. ¶ 146.

The plaintiffs contend that these statements were misrepresentations because no ticket purchase agreements or ticket-related insurance existed, TriPoint had not conducted an investigation and due diligence on the deal,[4] and therefore the

---

[4] The plaintiffs allege in the alternative that, if TriPoint did conduct such an investigation and performed such due diligence,

defendants did not actually intend to distribute any investment returns to the plaintiffs. If no ticket purchase agreements existed, the defendants' contention that they could not show the plaintiffs the ticket purchase agreements because they were confidential was also false. Thus, the Amended Complaint plainly specifies the alleged misrepresentations, identifies who made them, where and when they were made, and explains why they were fraudulent. The plaintiffs have therefore pleaded misrepresentations with sufficient specificity under the PSLRA and Rule 9(b). See 15 U.S.C. § 78u-4(b); ATSI, 493 F.3d at 99. Further, the alleged misrepresentations cannot be dismissed as immaterial because they plausibly would have "significantly altered the 'total mix' of information" available to the plaintiffs. Basic, 485 U.S. at 231-32.

The plaintiffs have therefore met their burden of pleading material misrepresentations by the defendants.

### ii.

The defendants also argue that the Section 10(b) claim should be dismissed because the plaintiffs have failed to plead scienter. To meet the scienter requirement in a 10b-5 action under the PSLRA, a plaintiff must "state with particularity

---

then the defendants' representations as to the ticket investment were knowingly and intentionally false because the entire venture was fraudulent. Am. Compl. ¶¶ 58, 96.

facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). This requires a showing "of intent to deceive, manipulate, or defraud," or recklessness. Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 188 (1976)). A plaintiff adequately pleads scienter where the plaintiff pleads facts showing either: 1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness. Blanford, 794 F.3d at 306 (citations omitted). Circumstantial evidence that a defendant "benefitted in a concrete and personal way from the purported fraud" can support an inference of scienter. Id. Scienter can also be shown by circumstantial evidence that the defendants engaged in illegal conduct or knew facts or had access to information suggesting that their public statements were not accurate. Id.; see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007) ("A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

The defendants argue that the plaintiffs have not sufficiently alleged the defendants' motive to commit fraud or conscious misbehavior. The defendants contend that the

20

plaintiffs have only proffered boilerplate assertions that, as officers or directors of TriPoint, Nathan, Elenowitz, and Boswell "must have known" that statements made to the plaintiffs were false.

These arguments have no merit, and they fail to contend with the particularized allegations in the Amended Complaint. The plaintiffs have met their burden of pleading scienter by specifically alleging that the defendants had a concrete motive to commit the fraud, and the defendants' opportunity to make these misrepresentations is not at issue. The plaintiffs have also pleaded strong circumstantial evidence of conscious misbehavior.

The defendants' motive, according to the plaintiffs, was that TriPoint received commissions based on the amount of money the defendants raised for the allegedly fraudulent ticket investments, and that each of the defendants participated in those profits. The plaintiffs allege that the Executive Summary provided to the plaintiffs stated that TriPoint was to receive a 5% commission based on the gross proceeds received by 875 Holdings for the original ticket purchase investment and that the Profit Participation Purchase Agreement stated that broker-dealers (namely TriPoint) were to receive a 3% commission based on the gross proceeds received by Advanced Entertainment II with respect to the "Side Pocket" investments. Id. ¶¶ 74, 165. These

allegations sufficiently identify the defendants' motive and opportunity to induce the plaintiffs to purchase the investments at issue. See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155, 179-180 (S.D.N.Y. 2009); Sec. & Exch. Comm'n v. Zubkis, No. 97-cv-8086 (JGK), 2000 WL 218393, at *7 (S.D.N.Y. Feb. 23, 2000).

The plaintiffs have also pleaded that the defendants acted with conscious misbehavior because they made false representations despite having knowledge that their representations were false. The plaintiffs have sufficiently alleged that the defendants represented that there were agreements and insurance when there were not, and that they conducted due diligence that they knew they had not conducted. These are sufficient allegations of conscious misbehavior.

### iii.

Finally, the defendants urge that the plaintiffs have not alleged that the plaintiffs reasonably relied on the defendants' alleged misrepresentations. This argument is also without merit. The Second Circuit Court of Appeals has explained that "our evaluation of the reasonable-reliance element has involved many factors to consider and balance, no single one of which is dispositive." STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 81 (2d Cir. 2011) (internal quotation marks, citations, and brackets omitted). Factors relevant to the

determination of a plaintiff's reasonable reliance include: "access to the relevant information . . . concealment of the fraud[,] . . . [and] the opportunity to detect the fraud." Ashland, 652 F.3d at 338 (citation omitted).

The plaintiffs allege that they relied on the defendants' statements, and that, given the defendants' professed expertise and accreditations --- which the defendants pointed out by referring the plaintiffs to TriPoint's website --- this reliance was reasonable. The plaintiffs allege that the defendants refused the plaintiffs' request to view the underlying ticket purchase agreements, but assured the plaintiffs that TriPoint had reviewed them and that they checked out. This prevented the plaintiffs from detecting any fraud. Thus the defendants had exclusive access to the relevant information and interfered with the plaintiffs' opportunity to detect any fraud. See id. These allegations, taken as true, strongly support the plaintiffs' reliance on the defendants' representations as reasonable.

The defendants contend that several of the plaintiffs --- I.B. Trading, JoRon Management, Sasson, Koltun, and Luxenberg --- have not adequately pleaded reasonable reliance in part because the plaintiffs have only alleged misrepresentations made directly to Behar, Levy, and Macey. There is no merit to this argument. "[I]ndirect reliance is established if (1) the plaintiff received the information from someone who had received

it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to the plaintiff." Fragin v. Mezei, No. 09-cv-10287 AJN, 2012 WL 3613813, at *14 (S.D.N.Y. Aug. 22, 2012) (internal quotation marks and citation omitted).

The plaintiffs have alleged that each of Behar, Levy, and Macey were acting on behalf of all the plaintiffs when they met and corresponded with the defendants, and that the defendants were aware of this. Moreover, the plaintiffs allege that when Nathan first approached Behar, Nathan sought investments from Behar's "investment group." Am. Compl. ¶ 45. These allegations support the plausible inference that the defendants intended the information they provided to Behar, Levy, and Macey be conveyed to the other plaintiffs, two of which --- I.B. Trading and JoRon Management --- are affiliated with Behar and Levy, respectively. Elizabeth Macey invested with her husband, Thomas Macey, and it is reasonable to infer that statements made to Macey were intended to be conveyed to his wife. Moreover, the defendants allegedly accepted $100,000 from each of Fusion Capital and Koltun with respect to the first investment, and $100,000 from each of Fusion Capital, Koltun, and Luxenberg with respect to the "Side Pocket" investments. Id. ¶¶ 120, 169. This also suggests that the defendants understood that the information

provided to Behar, Levy, and Macey would be conveyed to the other investors.

In their reply papers, the defendants contend that the Executive Summary's disclaimer that the investments entailed a "high degree of risk," undermines the plaintiffs' allegations that the defendants promised a safe --- "no-brainer" --- investment. This general disclaimer, buried within two pages of boilerplate, does not eclipse the specific statements made by the defendants --- wholly separate from the Executive Summary. "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." In re Prudential Sec. Inc. Ltd. Partnerships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996). Similarly, the defendants contend that the Executive Summary's statement that "875 [Holdings] will require that the purchased tickets be honored if the event is rescheduled  . . . and/or that acceptable insurance arrangements are in place" undercuts any reliance by the plaintiffs on the defendants' representations that the tickets would be backed by insurance. Id. (emphasis in TriPoint Reply). This ignores the affirmative representations made to the plaintiffs that there were ticket purchase agreements and that insurance had been procured. Am. Compl. ¶¶ 54, 85, 95.

The plaintiffs have thus adequately alleged reasonable reliance by the plaintiffs.

The defendants' motion to dismiss the plaintiffs' claim under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, is therefore **denied.**

## B.

The defendants also move to dismiss the plaintiffs' claim under Sections 9(a)(4) and 9(f) of the Exchange Act (the Second Cause of Action). Section 9(a)(4), which applies specifically to broker-dealers, among others, closely parallels Section 10(b). Section 9(a)(4) makes it unlawful for any person selling or offering for sale, or purchasing or offering to purchase, a security:

> to make, regarding any security registered on a national securities exchange, [or] any security not so registered, ... for the purpose of inducing the purchase or sale of such security, ... which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which that person knew or had reasonable ground to believe was so false or misleading.

15 U.S.C. § 78i(a)(4). Section 9(f) creates a private right of action for violations of Section 9(a). 15 U.S.C.A. § 78i(f). Section 9(f) requires that the violation of Section 9(a) be "willful" and that the price of the security that is purchased or sold be affected by the violation. Chemetron Corp. v. Business Funds, Inc., 682 F.2d 1149, 1162 (5th Cir. 1982),

vacated and remanded, 460 U.S. 1007, (1983), initial opinion adhered to on remand, 718 F.2d 725, 728 (5th Cir. 1983) (adhering to initial partial dissent), reh'g en banc ordered, 718 F.2d 730 (5th Cir. 1983) (the parties settled before rehearing en banc). A claim under Section 9(a)(4) "requires a (1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price." Salvani v. ADVFN PLC, 50 F. Supp. 3d 459, 476 (S.D.N.Y. 2014), aff'd sub nom. Salvani v. InvestorsHub.com, Inc., 628 F. App'x 784 (2d Cir. 2015) (citation omitted).

The defendants contend that the plaintiffs have not alleged that any of the alleged misrepresentations, or anything else, affected the purchase or selling price of the ticket investments. The ticket investments were issued as a private placement at a fixed price. The plaintiffs did not plead that the defendants' misrepresentations affected the price of the ticket investments, nor did they respond to the defendants' contention that they were required to plead an effect on price. The plaintiffs have therefore abandoned their claim under Sections 9(a) and 9(f). See Lipton v. Cty. of Orange, New York, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) (collecting cases).

The defendants' motion to dismiss the plaintiffs' claim under Sections 9(a)(4) and 9(f) is therefore **granted**.

### C.

The plaintiffs allege that Boswell and Elenowitz are each jointly and severally liable for TriPoint's violations of the Exchange Act under Section 20(a) of that statute (the Third Cause of Action). "Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." Blanford, 794 F.3d at 305; 15 U.S.C. § 78t(a). To state a claim under Section 20(a) a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation marks omitted). The defendants argue that the plaintiffs' claim under Section 20(a) should be dismissed because the plaintiffs have not adequately alleged either an underlying violation of securities laws by TriPoint or that Boswell or Elenowitz are sufficiently culpable.

The defendants' first argument is without merit, as discussed above. Moreover, the plaintiffs have plainly alleged that Boswell and Elenowitz --- TriPoint's co-founders, the sole

members of TriPoint's "Executive Team," and between them TriPoint's COO, CCO and CEO --- were "controlling persons" within the meaning of the statute. Am. Compl. ¶¶ 232-36; see In re Virtus Inv. Partners, Inc. Sec. Litig., 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016) (the power to direct or cause the direction of management and policies through ownership or voting securities, by contract, or otherwise may establish control).

The remaining issue is whether the plaintiffs have adequately alleged that each of Boswell and Elenowitz were "in some meaningful sense a culpable participant" in the alleged fraud. Kaplan, 159 F.3d at 720. Sufficient culpability must approximate recklessness in the context of an alleged violation of Section 10(b). See In re Virtus Inv. Partners, 195 F. Supp. 3d at 542. The plaintiffs allege that Elenowitz represented that TriPoint had investigated and vetted the original ticket investment, and that it was a "no-brainer" because the investment was backed by physical tickets, which were insured in case an event was canceled. Am. Comp. ¶¶ 84, 85. Taking as true the plaintiffs' allegation that no ticket purchase agreements were ever executed, no insurance secured, and no physical tickets purchased, the plaintiffs plausibly allege that Elenowitz knew that his statements were false or consciously disregarded the facts. That is, Elenowitz had not even verified the basic facts that he represented to the plaintiffs --- the

existence of the agreements and insurance --- much less that the investment was a "no-brainer." See Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47-48 (2d Cir. 1978), amended sub nom. Rolf v. Blyth Eastman Dillon & Co., No. 77-cv-7104, 1978 WL 4098 (2d Cir. May 22, 1978) (broker's assurances that the plaintiff's investment advisor "knew what he was doing" without investigating to determine "whether there was a basis for the [defendant's] assertions" met scienter requirement of 10b-5 claim).

The plaintiffs allege that Boswell directed Nathan to forward to the plaintiffs e-mails showing that Boswell's compliance review was a required precondition to the investments being placed, that Boswell had personally performed a compliance review of the investment documentation, and that the investments passed Boswell's review. Am. Compl. ¶¶ 112-14. Boswell could not have completed a compliance review of the investment documentation and failed to realize that no underlying ticket purchase agreements or insurance existed, unless he consciously disregarded the absence of such agreements. Indeed, Boswell represented that he had verified this very documentation. These allegations sufficiently plead that Boswell and Elenowitz acted with sufficient culpability to state a claim under Section 20(a). See Rolf, 570 F.2d at 47-48.

The defendants' motion to dismiss the plaintiffs' claim under Section 20(a) of the Exchange Act is therefore **denied**.

D.

The defendants move to dismiss the plaintiffs' Fourth Cause of Action for breach of fiduciary duty under New York law. The defendants argue that the plaintiffs have not adequately alleged that a fiduciary relationship existed between the defendants and the plaintiffs. New York courts employ a flexible approach in determining whether a fiduciary duty exists:

> Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.

Penato v. George, 383 N.Y.S.2d 900, 904-05 (App. Div. 1976). "At base, the existence of a fiduciary relationship is a factual question." Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co., 179 F. Supp. 2d 118, 151 (S.D.N.Y. 2000). Investment advisors owe a fiduciary duty to the clients they advise. See Rasmussen v. A.C.T. Envtl. Servs. Inc., 739 N.Y.S.2d 220, 222 (App. Div. 2002); Scalp & Blade, Inc. v. Advest, Inc., 722 N.Y.S.2d 639, 640 (App. Div. 2001).

The defendants argue that the plaintiffs' use of "group pleading" prevents the plaintiffs from meeting the requirement

31

to plead a breach of fiduciary duty claim that sounds in fraud with the particularity required by Rule 9(b). The plaintiffs do not contest that their fiduciary duty claim arises from the defendants' alleged fraud. Even under Rule 9(b)'s heightened pleading standard, however, the plaintiffs have sufficiently pleaded a fiduciary duty claim against the defendants.

The defendants' argument ignores the many detailed allegations in the Amended Complaint. The plaintiffs point to TriPoint's professed expertise in finance, investments, securities, and compliance, among other areas. See Am. Compl. ¶ 252. The Amended Complaint also contains more specific allegations, including that the defendants undertook to advise the plaintiffs with regard to the ticket investments, inviting the plaintiffs to rely on their assessment, recommendation, and due diligence. For example, the plaintiffs claim that at the initial meeting on December 10, 2015, "Nathan advised Behar and Levy that the ticket investments were extremely safe and low risk," and that TriPoint had "completed full due diligence related to the ticket investment and the companies offering the investment, and highly recommended it." Id. ¶ 54. At the second meeting, in December, 2015, the plaintiffs allege that Elenowitz told Behar that the ticket investment was a "no-brainer" and that TriPoint had conducted due diligence to confirm that the investment was backed by physical tickets and insurance. Id.

32

¶¶ 84, 85. And Boswell allegedly directed Nathan to forward to the plaintiffs e-mails stating that Boswell had personally reviewed the documents underlying the ticket investments. Id. ¶¶ 112-14. The defendants' representations as to their due diligence regarding the investments were crucial because the defendants refused to allow the plaintiffs to review the underlying ticket purchase agreements. Id. ¶ 95. The plaintiffs plausibly allege that the defendants sought and received the plaintiffs' trust, placing the defendants in an advantageous position vis-à-vis the plaintiffs, who were not able to review the crucial documents themselves. See EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31-32 (N.Y. 2005) (rejecting the defendant's argument that underwriters do not owe a fiduciary duty to issuers of securities in an arm's-length transaction where the plaintiff alleged "an advisory relationship that was independent of the underwriting agreement").

Given the fact-specific nature of the fiduciary inquiry, the Court cannot dismiss the plaintiffs' breach of fiduciary duty claim. The defendants' motion to dismiss the plaintiffs' breach of fiduciary duty claim is therefore **denied**.

**E.**

The plaintiffs also allege claims for negligent misrepresentation (the Fifth Cause of Action) and negligence (the Sixth Cause of Action). The defendants argue that the

33

plaintiffs' claim for negligence fails because they allege only economic losses, which are not recoverable. The plaintiffs did not respond to this argument, and thus they appear to have abandoned their claim for negligence. See Lipton, 315 F. Supp. 2d at 446. The plaintiffs' claim for negligence is therefore **dismissed.**

The defendants argue that the plaintiffs' claim for negligent misrepresentation fails because the defendants did not owe the plaintiffs a duty of care. The defendants argue that they acted solely as a placement agent for the issuers of the ticket investments, and that a broker-dealer acting as a placement agent owes a duty to the issuer of securities and not to the purchasers of securities.

In order to state a claim for negligent misrepresentation under New York law, a plaintiff must allege that:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that [they] should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to [their] detriment.

Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 114 (2d Cir. 2012). As discussed with respect to the plaintiffs' federal securities law claims, the plaintiffs have alleged that the defendants made at least recklessly false misrepresentations,

which the plaintiffs reasonably relied on to their detriment. The issue with regard to this claim is whether the defendants "had a duty, as a result of a special relationship, to give correct information." Id.

In order for a duty to exist with respect to a claim for pecuniary loss from a negligent misrepresentation, New York courts require "actual privity of contract between the parties or a relationship so close as to approach that of privity." Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson, 539 N.E.2d 91, 94 (N.Y. 1989). In Ossining, the New York Court of Appeals examined the long history of the near-privity requirement, which requires "(1) awareness that the [representations] were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance." Id. at 95. The defendants' representations to the plaintiffs in connection with the ticket investments clearly evinced awareness that the representations were to be used for the purpose of the investments. The plaintiffs allegedly relied on the defendants' representations. And the alleged misrepresentations --- including that the investments were a "no-brainer" and that the plaintiffs could not examine the underlying ticket purchase

agreements, but that TriPoint had conducted due diligence confirming their legitimacy --- plainly invited the plaintiffs to rely on the defendants' assurances. See Ossining, 539 N.E.2d at 95-96.

The primary case the defendants rely on, BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 866 F. Supp. 2d 257 (S.D.N.Y. 2012), does not help them. In that case, the issue was whether a broker's mere participation constituted a recommendation, thus triggering fiduciary duties. Id. at 267-68. There was no allegation that the broker had provided misleading advice, nor that the third-party plaintiffs had relied on the broker's advice. Id. at 271. In this case, the plaintiffs allege that the defendants recommended the ticket investments to them by using false and misleading information.

The defendants' motion to dismiss the plaintiffs' claim for negligent misrepresentation is therefore **denied.**

**F.**

The plaintiffs also bring a state law claim for fraud, fraudulent misrepresentation, and fraudulent inducement (the Seventh Cause of Action). The defendants argue that the plaintiffs' fraud claim should be dismissed because the plaintiffs have not alleged any material misrepresentations by the defendants with sufficient particularity, because the defendants owed no duty of disclosure to the plaintiffs, and

because the plaintiffs have not sufficiently pleaded scienter with respect to the defendants.

"Courts in the Second Circuit have found that the elements of common law fraud are 'essentially the same' as those that must be pleaded to establish a claim under Section 10(b) and Rule 10b-5." Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc., 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010), aff'd sub nom., Meridian Horizon Fund, LP v. KPMG (Cayman), 487 F. App'x 636, 641 (2d Cir. 2012) (citation omitted); Camofi Master LDC v. Riptide Worldwide, Inc., No. 10-cv-4020 (CM), 2011 WL 1197659, at *10 (S.D.N.Y. Mar. 25, 2011) ("For the same reason that Plaintiffs' federal securities fraud claims are sufficiently pled, Plaintiffs have pled sufficient facts that give rise to a strong inference of fraudulent intent."). For the reasons explained above, the plaintiffs have adequately pleaded material misrepresentations by each of the defendants, and that there is a plausible inference of scienter. Likewise, to the extent the plaintiffs' fraud claim requires them to allege that the defendants owed them a duty,[5] for the reasons explained above in

---

[5] The defendants' argument that the plaintiffs must allege that the defendants owed the plaintiffs a duty is premised on the defendants' contention that the plaintiffs' 10b-5 and fraud claims are based "on alleged nondisclosure." See Elenowitz Mem. of Law at 17. However, as recounted in detail in the Amended Complaint and this Opinion, the plaintiffs allege numerous affirmative misrepresentations.

the context of the negligent misrepresentation claim, the plaintiffs have satisfied this requirement.

The defendants' motion to dismiss the plaintiffs' fraud claim is therefore **denied.**

**G.**

The plaintiffs' Eighth Cause of Action alleges a claim under New York General Business Law § 349, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349 (McKinney). The defendants argue that § 349 is intended to prevent injury to the public, and that the plaintiffs, as investors in a private placement transaction, have not alleged a public harm.

To sustain a claim under § 349, the plaintiffs must allege that "(1) defendants engaged in conduct that is deceptive or misleading in a material way; (2) the deceptive conduct was 'consumer-oriented'; and (3) plaintiffs have been injured 'by reason of defendants' conduct." In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig., 175 F. Supp. 2d 593, 630 (S.D.N.Y. 2001) (citing Karlin v. IVF America, Inc., 712 N.E.2d 662 (N.Y. 1999)). However, "private contractual disputes upon matters not affecting the consuming public are not actionable" under § 349. Shou Fong Tam v. Metro. Life Ins. Co., 913 N.Y.S.2d 183, 185 (App. Div. 2010) (citations omitted).

"The clear weight of authority is that claims arising out of securities transactions are not the type of consumer transactions for which General Business Law § 349 was intended to provide a remedy." Prickett v. New York Life Ins. Co., 896 F. Supp. 2d 236, 252 (S.D.N.Y. 2012) (collecting cases) (internal quotations and citations omitted); but see Scalp & Blade, Inc. v. Advest, Inc., 722 N.Y.S.2d 639, 641 (App. Div. 2001)("we see no basis for invoking any blanket exception under the statute for securities transactions"). At least one New York court has specifically determined that private placements are not the proper subject of a § 349 claim. Smith v. Triad Mfg. Grp., Inc., 681 N.Y.S.2d 710, 712 (App. Div. 1998). As the defendants point out, the investments at issue in this case were not offered to the general investing public. The defendants' alleged conduct was therefore not sufficiently "consumer oriented" to fall within the bounds of § 349.

The defendants' motion to dismiss the plaintiffs' § 349 claim is therefore **granted.**

**H.**

The plaintiffs also allege a claim for unjust enrichment and for the establishment of a constructive trust (the Ninth Cause of Action). As the defendants point out, the plaintiffs failed to respond to the defendants' arguments against the establishment of a constructive trust. It thus appears the

plaintiffs have abandoned this claim. See Lipton, 315 F. Supp. 2d at 446. In any event, a constructive trust is simply a remedy and is not the basis for a separate cause of action. See Islip U-Slip LLC v. Gander Mountain Co., 2 F. Supp. 3d 296, 307 (N.D.N.Y. 2014) ("a constructive trust is a remedy imposed 'when property has been acquired under such circumstances that the holder of legal title may not in good conscience retain the beneficial interest therein.'") (quoting Sec. Pac. Mortgage and Real Estate Serv., Inc. v. Rep. of Phil., 962 F.2d 204, 210 (2d Cir. 1992)). The claim for a constructive trust is therefore **dismissed** without prejudice.

The New York Court of Appeals has explained that in order to plead adequately a claim for unjust enrichment, "the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Georgia Malone & Co. v. Rieder, 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks and citations omitted). The defendants argue that because the plaintiffs do not allege that they paid the defendants directly, their claim for unjust enrichment fails. The plaintiffs respond by pointing to In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 233-34 (S.D.N.Y. 2012), which determined that indirect purchasers could bring antitrust claims against a

pharmaceutical manufacturer. In that case, the court determined that under New York unjust enrichment law plaintiffs need only plead that a defendant had "received some benefit," meaning that "direct dealings (contractual or otherwise)" were not required. Id. (internal quotation marks and citations omitted) (emphasis original).

In this case, the plaintiffs allege that the defendants induced them to invest in a Ponzi scheme, where the defendants' compensation was directly tied to the amount of investment capital raised. Am. Compl. ¶¶ 74, 165. That is an even more direct benefit to the defendants than the benefit conferred in In re DDAVP, which was the increased demand from the indirect purchasers' purchase of a pharmaceutical at inflated prices. See In re DDAVP, 903 F. Supp. 2d at 234. Plainly it would be "against equity and good conscience to permit" the defendants to retain commissions based on money obtained from allegedly swindled investors. The plaintiffs have therefore stated a claim for unjust enrichment.

The defendants' motion to dismiss the plaintiffs' claim for unjust enrichment is therefore **denied**.

## IV.

Finally, the defendants move to strike Exhibit B to the Amended Complaint, and references thereto, under Federal Rule of Civil Procedure 12(f). Exhibit B is a complaint alleging similar

allegations against TriPoint, Elenowitz, and Boswell, filed by Adam Blank, et al. (the "Blank Action"). The defendants argue that, as a matter of law, references to preliminary steps in litigations that have not resulted in an adjudication on the merits are "immaterial under Rule 12(f)." See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (quoting Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976)).

Federal Rule of Civil Procedure 12(f) provides that "the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are not to be freely granted, and no deletions will be made unless it is clear that the allegations are without [basis]." Laub v. Genway Corp., 60 F.R.D. 462, 465-66 (S.D.N.Y. 1973) (citations and quotations omitted). Moreover, the movant should show that they will be prejudiced if the attacked allegations are left in the pleadings. Allstate Ins. Co. v. Home Ins. Co., No. 97-cv-4322 (HB), 1997 WL 639254, at *1 (S.D.N.Y. Oct. 15, 1997). As another court in this district noted:

> there has arisen since the adoption of [Rule 12(f)] general judicial agreement, as reflected in the extensive case law on the subject, that motions to strike under Rule 12(f) should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and

may cause some form of significant prejudice to one or more of the parties to the action.

VNB Realty, Inc. v. Bank of Am. Corp., No. 11-cv-6805 (DLC), 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013) (internal quotation marks, brackets, and citations omitted). Moreover, unlike in Lipsky, the Blank Action has not already resulted in a consent decree. See Lipsky, 551 F.2d at 892-93. The allegations in the Blank Action are relevant because they closely parallel those at issue in this case against the same defendants (other than Nathan) revolving around the same alleged Ponzi scheme. They provide some basis for the plaintiffs' allegations in this case.

The defendants' motion to strike the Blank Action and references thereto is therefore **denied.**

## CONCLUSION

The Court has considered all the parties' arguments. To the extent any arguments are not specifically addressed above, they are either moot or without merit. The defendants' motion to dismiss the Amended Complaint is **granted in part and denied in part.** The defendants' motion to strike Exhibit B to the Amended Complaint

and references thereto is **denied.** The Clerk of Court is directed to close all pending motions.

SO ORDERED.

Dated:    **New York, New York**
                    **November 15, 2017**

                                    **John G. Koeltl**
                          **United States District Judge**